**FLOTILL PRODUCTS, INC., a corporation, Mrs. Meyer L. Lewis, Albert S. Heiser, and Arthur H. Heiser, individually and as officers of said corporation, Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 19521.**

United States Court of Appeals Ninth Circuit.

March 16, 1966.

Rehearing Granted June 20, 1966.

As Amended by Court en banc Aug. 15, 1966.

Hamley, Circuit Judge, dissented in part.

William Simon, J. Wallace Adair, John H. Quinn, Jr., of Howrey, Simon, Baker & Murchison Washington, D. C., Jefferson E. Peyser, San Francisco, Cal., for petitioners.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, E. K. Elkins, Gerald J. Thain, Attys., F. T. C., Washington, D. C., for respondent.

Before BARNES and HAMLEY, Circuit Judges, and MATHES, Senior District Judge.

BARNES, Circuit Judge:

This is a petition to review and set aside an order of the Federal Trade Commission against petitioners. The Federal Trade Commission had jurisdiction to conduct the proceedings below pursuant to section 11(a) of the Clayton Act, 15 U.S.C. § 21(a). This court has jurisdiction to review the order of the Commis-

sion pursuant to section 11(c) of the Clayton Act, 15 U.S.C. § 21(c), and section 5(c) of the Federal Trade Commission Act, 15 U.S.C. § 45(c).

Petitioners in this proceeding are Flotill Products, Inc., which in June 1961 changed its name to Tillie Lewis Foods, Inc., and Mrs. Meyer L. Lewis, Albert S. Heiser, and Arthur H. Heiser, the owners and officers of the corporate petitioner. Flotill is a California corporation engaged in the processing, canning, and sale of certain fruit and vegetable items. Flotill also packs a line of dietetic foods which were not involved in the proceedings below. Mrs. Lewis owns 94.5% of Flotill's stock and is its president and executive officer. Albert S. Heiser owns 2.744% of Flotill's stock and is its vice president in charge of sales. Arthur H. Heiser owns 2.748% of the Flotill stock and is its vice president in charge of production. The Heisers are nephews of Mrs. Lewis.

On August 6, 1958, the FTC issued a complaint against the corporate and individual petitioners, alleging violations of sections 2(c) and (d) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. §§ 13(c), (d). The section 2(c) charges were founded on the conduct of Flotill in:

(1) Discontinuing the payment of a 2½% commission to the brokerage firm of Bushey & Wright, sometime prior to 1955, on sales made directly to the Nash-Finch Company, a large midwestern wholesale grocer, and the subsequent payment to Nash-Finch of a 2½% allowance for advertising and promotion which the FTC counsel contended were really payments "in lieu of brokerage" proscribed by section 2(c); and

(2) the payment by Flotill and Nash-Finch of ½% each to Bushey & Wright for work in arranging "pool car" shipments from Flotill to Nash-Finch of less than car-load lots which was instituted after Flotill had stopped paying Bushey & Wright the 2½% commission on its direct sales to Nash-Finch.

The section 2(d) charges were based on the discriminatory payment by Flotill of promotional allowances in 1956–1957 to Elm Farm Foods Company and Stop & Shop, Inc., retail grocers in the Boston, Massachusetts area, while not paying such promotional allowances to First National Stores, Great Atlantic & Pacific Tea Company, Star Market Company, and Supreme Markets, Inc., who were in competition with the "favored" customers in the Boston area.

Proceedings before a hearing examiner of the FTC began on July 7, 1959, but were delayed while the petitioners' refusal to comply with a subpoena duces tecum was being litigated. 6 F.T.C. Statutes and Court Decisions 665 (1959), Flotill Products, Inc. v. F. T. C., 278 F.2d 850 (9th Cir.), cert. denied, 364 U.S. 920, 81 S.Ct. 284, 5 L.Ed.2d 260 (1960). At the conclusion of resumed hearings, the hearing examiner issued his opinion on March 25, 1963, in which he sustained the section 2(d) charge and that portion of the 2(c) charge relating to discounts "in lieu of brokerage" to Nash-Finch, but found that petitioners' dealing with field brokers did not violate section 2(c) and that the persons named as respondents in the complaint should not be held in their individual capacities for the violations found to exist. Cross-appeals were taken from the hearing examiner's decision to the Commission, which issued its decision on June 26, 1964, upholding the hearing examiner's determination as to the 2(c) and 2(d) violations, but reversing his determination that the order to be entered should not apply to the individual petitioners as well as to the corporation.

Procedural questions arise as a result of the hearing before the Commission, in that the full Commission consists of five members but only three participated in the decision because there was one vacancy and one commissioner did not hear the oral arguments and did not join in the decision. The opinion for the Commission was written by Chairman Dixon; Commissioner MacIntyre wrote a separate opinion concurring with Dixon

with the exception of the dismissal of the charge concerning dealings with "field brokers"; and Commissioner Elman filed a separate opinion in which he *concurred* in the result as to the 2(d) charge and the inclusion in the order of the corporate officers in their individual capacities, *agreed* with the result but differed on the reasoning as to the dismissal of the 2(c) charge insofar as it pertained to "field brokers" transactions, and *dissented* from the holding that the allowances which Flotill gave to Nash-Finch were "in lieu of brokerage and therefore violated section 2(c)."

Following the issuance of the Commission decision, petitioners here filed a petition for reconsideration before the Commission. Reconsideration was denied in an order issued September 3, 1964, in which the grounds for reconsideration were answered by the Commission. This petition to review and set aside the final order of the Commission followed.

### I—*Alleged Procedural Defects.*

Petitioners contend that the Commission's order must be set aside as to both the section 2(c) and 2(d) orders because at least three members of a five member commission must affirmatively vote for an order, and must vote for it on the same grounds, in order for it to become a valid order of the commission. Petitioners argue that this requirement was not met as to the section 2(c) order because only Commissioners Dixon and MacIntyre agreed to it and Commissioner Elman dissented, and was not met as to the section 2(d) order because Commissioner Elman's concurrence does not indicate that it was on the same grounds or relied on the same evidence as that relied upon by Dixon and MacIntyre.

■ First, as to the section 2(c) decision in which only two Commissioners agreed. We have examined the authority and arguments put forth by both parties and find ourselves in agreement with petitioners that, absent statutory author-

ity or instruction to the contrary, three members of a five member commission must concur in order to enter a binding order on behalf of the commission. (Tr. 119). This was not done in the case of the 2(c) order here in dispute.

Respondent places primary reliance on the case of Atlantic Refining Company v. F. T. C., 344 F.2d 599 (6th Cir. 1965). We agree that the language used by the court in that case is authority for respondent's position, but find ourselves unconvinced by the "succinct" disposal of the issue in that case. The court's entire treatment of the point here in dispute is contained in this statement:

> "As to other issues presented by petitioner, we can be more succinct. The rules of the Federal Trade Commission since its inception have provided for decision by the majority of panels of three members. We believe this rule is within the Commission's power to make and is wholly valid. Drath v. Federal Trade Commission, 99 U.S.App.D.C. 289, 239 F.2d 452 (1956), cert. denied 353 U.S. 917, 77 S.Ct. 666, 1 L.Ed.2d 664 (1957)." (344 F.2d at 607.)

Petitioners correctly point out that the court in *Atlantic Refining* both misconstrued the FTC rule[1] and relied upon a case, *Drath,* supra, which is not shown to be in point. In the *Drath* case the court expressed its approval of the Commission rule that "A majority of the members of the commission shall constitute a quorum for the transaction of business." It does not appear that the order which resulted from a three man panel hearing the cause was concurred in by less than three, which would be a majority of the Commission. This did not raise the issue here in dispute. Since the statement from *Atlantic Refining* states a bare conclusion, and makes no attempt to support its position in reason, we are unenlightened as to why the court thought the "majority of the quorum" rule applicable or desirable.

---

1. That rule states: "A majority of the members of the Commission constitutes a quorum for the transaction of business." 16 C.F.R. 1.7.

We readily agree respondent's position is also supported by Frischer & Co. v. Bakelite Corporation, 39 F.2d 247 (C.C. P.A.), cert. denied 282 U.S. 852, 51 S.Ct. 29, 75 L.Ed. 755 (1930), wherein the Court of Customs and Patent Appeals stated that "the trend of modern authority is that in collective bodies other than courts, even though they may exercise judicial authority, a majority of a quorum is sufficient to perform the function of the body." (39 F.2d at 255.) But the court then proceeds to support its statement with a series of state decisions dealing with town meetings and city councils, which frankly strike us as inapposite when we seek to determine the rule which is to govern decisions of a statutorily created administrative tribunal like the Federal Trade Commission.

Respondent has previously used this case, and the *Drath* case, supra, to support the authority of a two-man majority of a three-man quorum. Borden Co., F.T.C. Docket No. 7474, April 10, 1964 (15 Pike and Fischer Administrative Law (2d) 344–5.)

■■ Respondent seeks also to support its position by reference to section 1 of the Federal Trade Commission Act, 15 U.S.C. § 41, and to a rule of the FTC, 16 C.F.R. § 1.7. We do not consider this authority determinative. The pertinent provision in section 1 of the FTC Act (last sentence of first paragraph) states "A vacancy in the commission shall not impair the right of the remaining commissioners to exercise all the powers of the commission."[2] This provision only has the effect of authorizing action by less than the full commission; it does not provide that less than a majority of the full commission may enter a final order, for in the event of a single vacancy a majority of the remaining commissioners is still three. The FTC rule, referred to earlier in the *Atlantic Refining* case, supra, provides that "A majority of the members of the Commission constitutes a quorum for the transaction of business." We could, perhaps, agree that the reasonable construction of such a rule would be that a majority of the quorum would be sufficient to render a decision, but do not find that argument dispositive in the absence of a clear showing that the FTC regulation is within the power of the FTC to adopt, tested in the light of the extent of the power conferred upon the FTC by Congress. Respondent stresses the fact that such a rule has been in effect for forty years. We cannot believe that a long adherence to an improper rule (if indeed it is improper) gives the Commission any vested right to continue such adherence. As petitioners accurately point out, when Congress wanted to authorize the exercise of the powers of an administrative body by less than the full body in other situations, it did not lack the words to do so expressly. Cf. National Labor Relations Board, 29 U.S.C. § 153(b); Interstate Commerce Commission, 49 U.S.C. § 17(1), Federal Power Commission, 16 U.S.C. § 792.

We do not desire to overstate our agreement with petitioners in this matter, and therefore we have stated that respondent's position is not without support. As already noted, the *Atlantic Refining* and *Frischer* cases, supra, directly support that position, and *Drath*, supra, may be said to do so inferentially. It might also be argued, although respondent has not done so, that the express permission of Congress to the NLRB and the ICC to delegate its authority to panels, and congressional acquiescence in the FTC quorum rule for a long period reflects congressional approval of such a policy of expediting the work of administrative bodies. On the other hand, it is difficult to believe that Congress conceived of the five-member FTC with its politically balanced make-up, permitting two of its members to speak for the Commission, and failed to specifically provide enabling legislation.

■ Respondent puts forth an additional argument, which we believe merits

---

2. We note the reference in the Act is singular and not plural. Suppose there were plural vacancies? Would respondent contend that if there were four vacancies one member could act?

consideration: that "the necessity of administrative agencies fashioning their own procedural rules as well as their authority to do so has long been recognized by the courts. See Federal Communications Commission v. Schreiber, 381 U.S. 279, 85 S.Ct. 1459, 1467, 14 L.Ed.2d 383 (1965), and cases cited therein." While we agree with the general proposition stated by respondents, we are not assured that it controls the point in dispute here. The *Schreiber* case, for example, dealt with the interpretation of section 4(j) of the Communications Act of 1934, as amended, 47 U.S.C. § 154(j). That legislative action expressly granted to the FCC a measure of autonomy in determining its own procedures. Not only is such a specific grant of power lacking in the Federal Trade Commission Act, but the type of "procedural rules" referred to in *Schreiber* were not of the same nature as the quorum requirement here in dispute. The *Schreiber* case, and a number of cases cited therein, particularly Wallace Corporation v. N. L. R. B., 323 U.S. 248, 65 S.Ct. 238, 89 L.Ed. 216 (1944), Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943), and F. C. C. v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656 (1940), do, as respondent states, refer to the broad powers of administrative bodies in determining their own procedural rules. But in each of these cases the power of the administrative body to do so is premised on its expertise in dealing with one particular specific industry which it was designed to regulate. We do not quarrel with the propriety of administratively determined procedures in such cases, but do not believe that that same principle is applicable in this case *where the problem relates to the interpretation of the FTC's enabling legislation.* We do not think it proper for this court to amend the Federal Trade Commission Act nor to permit it to be amended by a Commission rule, in the absence of a stronger showing of congressional intent than has been made here, and in the presence of express provisions in the enabling legislation creating other agencies (such as the NLRB and ICC) to accomplish the result sought.

In light of the Commission's adherence to its "majority of a quorum" rule for such an extended period, we do not believe that the proper remedy would be to simply set-aside or deny enforcement of its section 2(c) order. Rather, we remand the section 2(c) violation to the Commission for further hearings to determine whether a majority of the Commission desire to enter such an order. We express no doubt as to the validity of the Commission's practice of conducting hearings before less than the full membership. We say only that an order of the Commission must be supported by three members in order to constitute an enforceable order of the FTC. Two of five is too few.

For the above reasons, we will remand, and await a further determination by the FTC before considering the facts and law relating to the alleged section 2(c) violations.

Petitioners assert that the order regarding the section 2(d) violation should also be denied enforcement because Commissioner Elman concurred in the result, but did not enumerate the grounds for his concurrence, nor the conclusions or findings upon which he based his concurrence, and that consequently "the Commission has provided no 'statement of * * * findings and conclusions' nor 'reasons or basis therefor' as required by Section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 1007(b)." We cannot agree. We approve the reasoning of the three judge district court in Chicago, B. & Q. R. Co. v. United States, 60 F.Supp. 580 (E.D. Ky.1945) where the court was faced with a similar contention in reviewing a freight rate order of the ICC. While petitioner argues that no grounds to support his concurrence can be taken from Commissioner Elman's simple statement following his section 2(c) dissent that "With respect to the other issues in the present case, I concur in the result" (Record, p. 114, n. 13), we believe it more reasonable to assume that his statement constituted a substantial adoption of Chairman Dixon's opinion for the Commission as to the 2(d) violations.

As stated by the court in *Chicago, B. & Q. R. Co.*, supra, "We interpret the statement by the fifth Commissioner that he 'concurs in the result' of both reports filed in this case to mean that, while he does not assent to all the comments or observations made therein, he is, nevertheless, sufficiently in accord with the rationale of them to enable him to agree * * *." 60 F.Supp. at 583.

### II—*Promotional Allowances.*

All three Commissioners who participated in the Flotill proceedings agreed that Flotill had violated section 2(d) in two particulars. First, by not making available to Stop & Shop in 1956 and 1957 the same promotional allowance which it made to Elm Farm Foods, a competitior of Stop & Shop in the Boston area, and second, by not making available any similar promotional allowance to customers who competed in the Boston area but who made their purchases in the "California Street" market and shipped the goods to Boston rather than buying through brokers in Boston as Elm Farm Foods and Stop & Shop did.

Petitioners attack the first section 2 (d) charge by asserting that Stop & Shop, which did not receive the allowance in 1957, had received such an allowance in 1956 and did not consider the availability of a promotional allowance from Flotill in determining whether to promote Flotill items, and that Flotill was not obligated to make a futile gesture by paying a promotional allowance where there was no consideration and when the payment of such allowance did not result in the increased promotion of its products.

Petitioners attack the findings supporting the second 2(d) violation by asserting (a) that it had no obligation to pay equivalent allowances for promotion in a local area to customers who choose to purchase in different markets thousands of miles apart; (b) that it had no way of knowing the ultimate destination of the goods purchased in the California Street market and hence is not chargeable with knowledge that the goods would be sold in competition with those sold by Flotill to Elm Farm Foods and Stop & Shop; (c) that in any event the allegedly "disfavored" purchasers were not "direct customers" of Flotill in Boston and thus Flotill was under no obligation to pay them a promotional allowance equivalent to the one paid all customers buying through its Boston broker to promote Flotill products in Boston; (d) that the Commission erred in including Food Center Wholesale Grocers, Inc., in the coverage of the cease and desist order in reliance on the Commission's holding in Fred Meyer, Dkt. No. 7492 (March 29, 1963),[3] without reversing the hearing examiner's decision excluding Food Center Wholesale Grocers, Inc. from consideration as a "disfavored" competing customer, and finally (e) that Commission counsel failed to sustain the burden of proving that customers who did not receive the promotional allowance were in competition with customers who did receive such allowances.

■ First, as to the discrimination between Elm Farm Foods and Stop & Shop in 1956 and 1957, we find substantial evidence on the record as a whole that an offer of a promotional allowance to Stop & Shop would not have been a "futile gesture," as petitioners contend, and that petitioners have not complied with and in fact have misconstrued the provision in the Federal Trade Commission Guides for Allowances and Service, 1 Trade Reg. Rep. § 3980, that a seller make a specific offer of a promotional allowance to meet the "availability" standard of section 2(d).[4] Accordingly, we believe that this portion of the 2(d) order is entitled to enforcement.

■ Second, the Commission's findings that Flotill knew or should have known that the goods sold to the four "disfavored" customers were intended

---

3. That order held that the Commission considers wholesalers whose customers compete with direct buying retailers to be in competition in the distribution of goods with the direct buying retailers.

for sale by the purchasers in the Boston area is supported by substantial evidence. The record shows that though these sales were negotiated in San Francisco, *all were billed and shipped by Flotill to the retailers in the Boston area,* and the testimony of Albert S. Heiser indicates that Flotill knew that it was making sales to the "disfavored" four in the Boston area. Furthermore, we agree with Chairman Dixon's contention that petitioners were under an obligation to determine whether customers in fact compete, and that "If it were otherwise, sellers could avoid their obligations under the statute simply by closing their eyes to the obvious." (R. 89.) Nor can we agree with petitioners' contention that Commission counsel failed to sustain the burden of proving that customers who did not receive the promotional allowance were in competition with customers who did. While we tend to believe that the hearing examiner's determination that "The competitive retail grocery market represented by the Boston area, as used herein, may be loosely defined to include an area within a radius of approximately 25 to 50 miles of the center of Boston," was a little too "loose" to be of much value, the record contains substantial evidence regarding the number and location of the retailers involved, and credible testimony from the grocery buyers of the firms involved, to establish that the six firms were in competition with one another in the Boston area. Further, in defining the requirements of the competitive market definition which must be made to show a violation of section 2(d), we adhere to the statement of Judge Hamley in Tri-Valley Packing Association v. F. T. C., 329 F.2d 694, 708 (9th Cir. 1964) that

"In our opinion, where a direct customer of a seller, operating solely on a particular functional level such as wholesaling or retailing, receives a promotional allowance not made available to another direct customer operating solely on the same functional level, it is unnecessary to trace the seller's goods of like grade and quality to the shelves of competing outlets of the two in order to establish competition."

We find the treatment of Food Center Wholesale Grocers, Inc., more troubling. After pointing out that the hearing examiner dismissed the charge that Food Center Wholesale should also be viewed as a "disfavored customer," Chairman Dixon went on to state:

"As a practical matter we see no real need to resolve the factual and legal questions here presented. The Fred Meyer decision places these respondents, no less than any other interstate sellers, on notice that the Commission considers wholesalers whose customers compete with direct buying retailers to be in competition in the distribution of goods with the direct buying retailers. Thus, to comply with the order to cease and desist to be entered herein, the respondents must henceforth consider Food Center and all similarly situated wholesaler customers as customers within the scope and meaning of Section 2(d). Since we have not reviewed the hearing examiner's findings and conclusions on this point (Findings 105 through 110), they will not be adopted as part of the Commission's decision." (R. 92–93.)

We note that the *Fred Meyer* decision is now before this court for review (Fred Meyer, Inc. v. F. T. C., 9 Cir., 359 F.2d 351), that petitioners contend that

---

4. Section 2(d), 15 U.S.C. § 13(d):

"(d) *Payment for services or facilities for processing or sale*

It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

earlier decisions of this court hold squarely against the Commission's decision in *Fred Meyer* (Cf. Tri-Valley Packing Association v. F. T. C., supra, 329 F.2d pp. 709–710; Alhambra Motor Parts v. F. T. C., 309 F.2d 213 (9th Cir. 1962)), and that the Commission did not even review the findings regarding Food Center. In light of these facts we consider it improper to include Food Center and other wholesale customers within the scope of the cease and desist order, for, though Chairman Dixon is correct in stating that petitioners have the same notice of the Commission's position as all other sellers as a result of the *Fred Meyer* decision, not all other sellers are subject to contempt proceedings for violation of that order as Flotill would be if Food Center and other wholesalers were included in the cease and desist order without the hearing examiner's findings on the point even having been reviewed. Although the remedial order is broadly framed and does not make reference to specific customers, we think it best to make clear that on the record in this case, the prohibition shall not be understood to extend to Food Center and other wholesalers.

III—*Scope of the Order.*

Petitioners direct two attacks against the drafting of the final order of the Commission. First, that it must be limited to the corporation and not extend to the named officers of the corporation, and second, that the order must be limited in scope and definitive in its terms.

In regard to the first ground of attack on the order, we note that the hearing examiner dismissed the complaint as to the Flotill executives in their individual capacities, finding that the corporate organization was stable and not a sham, and that "There is no showing and no suggestion of any special circumstances which would indicate a likelihood that the individual respondents would cause an evasion of any order which may be entered herein against the corporation." (R. 19.) In framing the order to include the individual petitioners, Chairman Dixon relied on no other fact than that

the three individuals owned and controlled the corporation. He concluded: "Under such circumstances, when the corporation is merely the alter ego of individuals, we have generally felt that an order against the individuals is necessary." (R. 95.)

We find that the Commission has abused the discretion granted it in framing the order to include the individual petitioners. The rather cavalier use of the "alter ego" doctrine finds no support in the record, and the order points to no evidence to challenge the findings of the hearing examiner that the corporate entity has ever been used in such a way as to justify treating it as the "alter ego" of its owners. We agree with petitioners that naming them individually in the order is tantamount to a finding on the evidence that they have personally violated, or can be expected to violate, the Clayton Act. We have not been shown the evidence in the record, if any there be, which supports such a conclusion. Accordingly, the Commission order to be enforced should not refer to the petitioners in their individual capacities. Authority for such deletion is to be found in Coro, Inc. v. F. T. C., 338 F.2d 149 (1st Cir. 1964) and Rayex Corp. v. F. T. C., 317 F.2d 290 (2d Cir. 1963).

Petitioners' attack on the scope and particularity of the balance of the final order is largely without merit. A great deal of discretion has been vested in the FTC as to how best to remedy industry abuses, and the Commission is not limited to prohibiting merely the precise acts which have already occurred. Jacob Siegel Co. v. F. T. C., 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946); F. T. C. v. Henry Broch & Co., 368 U.S. 360, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962). Accordingly, the rest of the language of the order is held proper.

Enforcement of the order of the Federal Trade Commission is ordered to the extent that the order relates to the section 2(d) violations, with the reference to petitioners in their individual capaci-

**234**

ties deleted. Enforcement of the order as it relates to the section 2(c) violations is denied. The matter is remanded to the FTC for further proceedings to determine whether a majority of the Commission join in the section 2(c) findings.

HAMLEY, Circuit Judge (dissenting in part):

I dissent from that part of the majority opinion which holds that at least three members of respondent Commission must affirmatively vote for an order, and since this requirement was not met with regard to the section 2(c) violation, that part of the proceedings must be remanded.

I think it is too late in the day to raise this question. The Commission rule (16 C.F.R. 1.7) providing that a majority of the members of the Commission constitutes a quorum for the transaction of business, has been in effect for forty years. The reasonable construction of that rule is that a majority of the quorum would be sufficient to render a decision. It has been so construed by the Commission for a very long time. Congress has not seen fit to negate that construction by enacting legislation expressly prohibiting the Commission from acting through a majority of a three-member quorum.

I concur in the remainder of the majority opinion.

On Petition to Review and Set Aside an Order of the Federal Trade Commission

PER CURIAM:

The court en banc takes the case solely for the purpose of deciding "When is a majority a majority?".

[The amendments ordered by the Court have been incorporated into the report.]

CHAMBERS, JERTBERG, KOELSCH and DUNIWAY, Circuit Judges, concur in the opinion of BARNES, Circuit Judge, as so modified.

MERRILL, BROWNING and ELY, Circuit Judges, concur with HAMLEY, Circuit Judge, in his dissent.