**LLOYD A. FRY ROOFING COMPANY, a corporation, and Lloyd A. Fry, Sr. and Lloyd A. Fry, Jr., Petitioners,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

No. 15389.

United States Court of Appeals Seventh Circuit.

Dec. 28, 1966.

Rehearing Denied Feb. 3, 1967.

Burton Y. Weitzenfeld, Chicago, Ill., James R. Fruchterman, Chicago, Ill., Kahn, Adsit, Arnstein, Gluck, Weitzenfeld & Minow, Chicago, Ill., of counsel, for petitioners.

J. B. Truly, Asst. Gen. Counsel, E. K. Elkins, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, General Counsel, Attorney for Federal Trade Commission, for respondent.

Before SCHNACKENBERG, SWYGERT and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This case arises on a petition to review a determination of the Federal Trade Commission that Lloyd A. Fry Roofing Company and two of its officers violated Section 2(a) of the Clayton Act (15 USC § 13(a)) by engaging in territorial price discriminations.[1] The Commission's opinion is reported in 3 Trade Regulation Reporter ¶ 17,303 (1965). The pertinent parts of its findings are summarized here.

Lloyd A. Fry Roofing Company ("Fry") is a Delaware corporation with its principal office and place of business in Summit, Illinois. Fry is the nation's largest producer of asphalt roofing products. There are nine other major manufacturers of asphalt roofing products and a large group of smaller manufacturers, the independents.

[1.] A charge that Fry sold below cost in violation of Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) was dismissed for want of proof.

In 1956–1960, Fry operated 19 asphalt plants throughout the United States. In 1958, it sold 14.2% of the nation's asphalt saturated felt, the product involved in the proceedings before the Commission. Asphalt saturated felt is used in the roofing industry as a moisture barrier under shingles. It is also used on "built-up" roofs which consist of several layers of such felt bonded together with hot asphalt.

Roughly, Fry's customers are classified into wholesalers and retail dealers. One of Fry's principal customers is Sears Roebuck & Co., a retailer purchasing at wholesale prices totaling $5,000,000 per annum during 1956 through 1960.

Before February 1956, Fry sold at prices five to seven percent below the other majors' published prices. However, in this industry, published prices are not always the actual prices but are varied to meet competitive needs.

In February 1956, Fry revised its price schedule. It increased its prices everywhere in the United States east of the Rockies. The new price list was based on freight equalization factors. In Knoxville, Tennessee, the critical market area here,[2] the new list price was $2.55 per roll for 60-pound rolls of 15 and 30-pound asphalt saturated felt.[3] The other majors followed this price change, and also made Knoxville a factory point for pricing.

In the Knoxville, Tennessee, market area, two of Fry's competitors were Volasco Products Company and The Ohio Paper Company. Volasco was organized in 1955 to manufacture and sell asphalt roofing products. Its plant was in Knoxville, Tennessee, and its principal competitors included Fry and the other nine majors and The Ohio Paper Company,

another independent. The Commission found that because of Volasco's natural freight advantage, it could profitably sell to dealers within the Knoxville market area in less than carload shipments at prices substantially lower than Fry's delivered prices for similar quantities there.

The Ohio Paper Company is located in Miamisburg, Ohio, and sold asphalt saturated felt in eastern Tennessee from 1955 to 1958 at 5% below the published prices of the majors. However, it stopped doing business in Tennessee in 1958 because prices were so low that it would be selling at a loss. It blamed Fry's low prices for its withdrawal from Tennessee.

From February to November 1956, Volasco was selling felt to dealers in less than carload lots in the Knoxville area at prices ranging from $2.01 to $2.25 per roll. In August 1956, Fry's list price in Knoxville was $2.62 per roll. However, on November 1, 1956, Fry lowered its list price to $2.36 per roll less a 5% secret rebate. The Commission found that Fry's prices to Knoxville customers were subsequently at or below Volasco's costs. During the relevant period, Fry's prices on asphalt saturated felt were higher in other felt factory areas than in the Knoxville area. In fact, until February 1, 1960, Fry maintained a price difference between Knoxville and other felt factory markets east of the Rockies.

Before November 1956, Volasco's sales of asphalt saturated felt had been increasing. Thereafter its sales diminished. Finally, because of low prices, Volasco sold felt only to its established customers instead of seeking new business.

The Commission found that Fry's February 1956 zoning price system was

---

2. Throughout this opinion, the Knoxville market area refers to that area within 100 miles of Knoxville. Until 1960, it was served by Fry's Brookville, Indiana, plant and thereafter by its Memphis plant. Fry's customers in the Knoxville area included three distributors in Knoxville, two in Chattanooga, and one in Kingsport, Tennessee. All were "approved distributors" and were substantial customers of Fry.

3. A 10% discount was given on truckload or carload purchases and, in certain circumstances, an additional 6% was given on such purchases by "approved distributors".

adopted to combat price competition, and that this price increase was adopted the following day by all majors. However, the independents continued to sell below the majors' published prices. Consequently, in April 1956, Fry's president agreed to "take corrective action" if the market did not become stabilized within 30 days. In the Knoxville market area, Volasco and Ohio Paper continued to sell at lower prices, and Fry took its "corrective" list price reduction there in November 1956. The Commission also found that Volasco's presence in Knoxville prompted Fry and the other majors to adopt their discriminatory price reductions and to make Knoxville a delivered-price basing point. The majors continued to maintain higher prices in areas where they were not competing with Volasco or other small independents.

The Commission found that Fry had initiated the price reduction of March 3, 1958, reducing prices to their lowest level in the Knoxville area. The Commission concluded that in making the Knoxville area discriminations, Fry had acted with predatory intent, with the purpose of disciplining small independent concerns selling below the prices established by Fry and followed by the other majors. The Commission rejected Fry's contentions that Volasco's losses were due to causes other than the territorial price discriminations.

The Commission concluded that there was a reasonable possibility that independents would be eliminated or seriously debilitated by Fry's discriminatory practices, and that their removal as viable competitors would adversely affect price competition generally in the Knoxville area and substantially injure competition with Fry. Finally, it rejected Fry's claim that its discriminatory lower prices in the Knoxville area were made in good faith to meet competition, as permitted by Section 2(b) of the Robinson-Patman Act (15 USC § 13(b)). Fry has not reiterated that defense here.

*Territorial Price Discriminations.*

■■ The relevant portion of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, provides (15 USC § 13(a)):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . * * *."

One of the purposes of this provision is to protect manufacturers from discriminatory practices of their competitors. Its viability in primary line competition cases was reiterated in Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 544–545, 80 S.Ct. 1267, 4 L.Ed. 2d 1385. As Commissioner Elman's concurring opinion observes in the present case, territorial price differences are not invalid *per se*, for the statute requires that there be a reasonable probability of injury to competition. Injury to a competitor is not the test; the test is injury to competition.

■ In most primary line cases under this statute, a violation cannot be established without a close study of the market, including data as to the discriminator's share of the market. However, in cases of predatory intent, "injury to even a single competitor should bring the Act into play". Attorney General's National Committee to Study the Antitrust Laws (1955) p. 165; Rowe, Price Discrimination under the Robinson-Patman Act (1962) pp. 145, 149. An intent to harm competitors distinguishes anti-

competitive price cutting from competitive activity not meant to be prohibited *per se* by the Robinson-Patman Act. An illicit intent serves to show the substantiality and probability of the competitive effects that may result from the price reductions. If, as here, the price reductions are substantial and prolonged, it is proper to invoke the statute to curb the discriminatory pricing. Sunderland, "Territorial Price Differentials Under the Robinson-Patman Act", 41 Chicago Bar Record 121, 128 (1959); Edwards, Maintaining Competition (1949) p. 170, note 75.

█ Since the Commission's finding of Fry's predatory intent is supported by the record, we conclude that it was unnecessary for the Commission to engage in an elaborate market study. As this Court stated in Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 843 (7th Cir. 1961):

> "If \* \* \* the projection [to ascertain the future effect of the price reductions made by the territorial price discriminator] is based upon predatoriness or buccaneering, it can reasonably be forecast that an adverse effect on competition *may* occur. In that event, the discriminations in their incipiency are such that they *may* have the prescribed effect to establish a violation of § 2(a). If one engages in the latter type of pricing activity, a reasonable probability may be inferred that its willful misconduct may substantially lessen, injure, destroy or prevent competition."

See also Note, "Competitive Injury under the Robinson-Patman Act", 74 Harv.L. Rev. 1597, 1609 (1961); Von Kalinowski, "Price Discrimination and Competitive Effects", 17 ABA Antitrust Section 360, 366–368 (1960). In the absence of predation, market analysis is needed to show a violation of Section 2(a) in primary line cases. Rowe, op. cit., pp. 150–151.

The Commission's finding that Fry acted with predatory intent is supported by the evidence. Thus the record shows that during the early 1950's, asphalt saturated felt capacity exceeded the demand, and a number of small independent manufacturers offered vigorous competition to the majors. Various large customers were able to compel low prices on this product. All this resulted in intense price competition by 1956.

When Fry inaugurated its February 1956 basing point price increase, its president described the current price fluctuations as emanating from "lack of confidence in each other". Fry submitted the February 1956 price schedule as its answer to the marketing situation. The day after Fry's new pricing system became effective, all the majors adopted it, one of them noting that the effect would be "to increase prices substantially."

Mr. Musico, manager of the Fry plant which served the Knoxville area, described the February 1956 plan as one to "clean up all this mess" and noted that it had been adopted by the entire industry. Under that plan, he concluded that the roofing industry's house "will be clean, for the first time, as certainly there is no room for any such chiseling."

Although the majors were willing to match each other's higher prices, by February 1956, the independents were quoting lower prices on less than carload lots. Low prices of independents prompted Fry's president to write that Fry "will take corrective action" in the event that the independents would not raise their prices.

After Fry adopted the February 1956 higher price system, Volasco and Ohio Paper Company continued to sell below the prices adopted by Fry and the other majors in the Knoxville area. On November 1, 1956, Fry inaugurated lower Knoxville list prices than it maintained in Chicago and other felt factory areas where only majors were competing with it. Until February 1, 1960, Fry continued to maintain lower prices in the Knoxville area than in those other areas. Fry's consistent undercutting of Volasco's prices permits an inference of predatory purpose. Rowe, Price Discrimina-

tion under the Robinson-Patman Act (1962) pp. 146–147; Sunderland, "Territorial Price Differentials Under the Robinson-Patman Act," 41 Chicago Bar Record 121, 128 (1959). Moreover, Fry knowingly undercut its competitors' prices; its prices were not made to meet competition.[4]

The following price table [5] depicts significant examples of Fry's and Volasco's prices from February 1956 to August 1958:

| Time | Fry's List | Fry's Dealer | Fry's "Approved Distributors" | Volasco's Range |
|---|---|---|---|---|
| 2–19–56–4–18–56 | $2.55 | $2.25 | $2.11 | $2.01–2.14 |
| 4–19–56–6–14–56 | 2.62 | 2.25 | 2.11 | 2.01–2.25 |
| 6–15–56–8–13–56 | 2.62 | 2.17 | 2.17 | 2.10–2.25 |
| 8–14–56–10–31–56 | 2.62 | 2.01 | 2.01 | 2.10–2.25 (Sizeable sales to McClung at 2.00) |
| 11–1–56–2–3–57 | 2.36 | 2.24 | 2.02 | 1.99–2.25 |
| 2–4–57–3–15–57 | 2.17 | 2.06 | 1.86 | 1.99–2.20 |
| 7–18–57–8–18–57 | 2.54 | 2.12 | 1.89 | 1.99–2.00 |
| 3–3–58–4–3–58 | 3.60 | 1.69 | 1.52 | 1.73–1.90 |
| 4–4–58–8–31–58 | 3.60 | 1.69 | 1.52 | 1.62–1.73 |

After March 1958 and for at least six months, Fry's above-shown dealer and "approved distributor" prices were below Volasco's costs, thus amply demonstrating the deep and sustained nature of Fry's price cutting. Although the price differential between Knoxville and Chicago decreased during this time, nevertheless, it remained substantial (27¢ for "approved distributors" vice 36¢). Another indication of Fry's motivation to discipline the small independents is its grant of a 52% discount to dealers and "approved distributors" in the Knoxville

4. Fry has not challenged the Commission's ruling that its price discriminations were not made in good faith to meet competition within the proviso in Section 2(b) of the Robinson-Patman Act.

5. The Fry prices to dealers and "approved distributors" are computed by deducting all discounts for which they are eligible from the list price. Volasco's prices are taken from its sales records. They are not exactly comparable to Fry's dealer prices because almost all of Volasco's sales are such that if they had been made by Fry, the buyer would not be entitled to any quantity discount. Volasco made isolated sales outside the price ranges as listed here. To use them as the limits of the price range would be to present a distorted picture of Volasco's sales activity.

market area (and other areas served by independents during this same period), which is the largest discount that it gave east of the Rockies (apart from certain areas of New York State).

The Commission also found that Fry was the price leader and was responsible for its own and other majors' discriminatory low prices. Fry initiated the November 1956 list price reduction and almost all the later reductions. Even though some of the other majors were also discriminators,[6] that of course does not absolve Fry. The law of negligence imposes liability on an individual if his "conduct is a substantial factor in bringing about the harm * * *". A.L.I. Restatement of the Law of Torts (2d) § 431. The principle surely applies to price discrimination because under Section 2 (a) there need be only a reasonable probability that the injury is the effect of the discrimination. Minneapolis-Honeywell Regulator Co. v. Federal Trade Commission, 191 F.2d 786, 792 (7th Cir. 1951), certiorari dismissed, 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245.

The record reveals that Fry was the instigator of the majors' price changes during the relevant period. Thus we have seen that the other majors adopted Fry's basing-point pricing system the day after it became effective. They also copied most of Fry's subsequent price changes. Officers of The Ruberoid Company (one of the Majors), Volasco and Ohio Paper Company testified that Fry had been the price leader, and upon inquiry, Fry's chairman did not deny this. It is clear that Fry created and maintained the discriminatory system. As stated by the American Bar Association's Section of Antitrust Law, "There was no question that competitive injury resulted to the two competitors [Volasco and Ohio Paper] as the result of Fry's price dis-

criminations." 31 ABA Antitrust Section 93 (1966).

 In view of Fry's predatory intent and price leadership, the Commission properly concluded that the effect of Fry's territorial price discriminations might substantially lessen competition within the meaning of Section 2(a) of the Robinson-Patman Act. Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 552, 80 S.Ct. 1267, 4 L.Ed.2d 1385. In this connection, it should be noted that in reviewing a similar record, another Court of Appeals has held that there was sufficient evidence of Fry's violation of Section 2(a) of the Robinson-Patman Act to submit to a jury. Volasco Products Company v. Lloyd A. Fry Roofing Company, 346 F.2d 661 (6th Cir. 1965), certiorari denied, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157.[7] Since like evidence was deemed sufficient to go to the jury, it was also sufficient to support the Commission's determination here. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456.

 Because we agree that Fry's discriminatory price reductions in the Knoxville market area were motivated by predatory intent, it is unnecessary to examine their effect upon competition in detail. Yet it should be observed that Volasco and Ohio were the main independents operating in this area and had both refused to adhere to the majors' prices. Since Volasco and Ohio Paper were the principal competitors of the majors in this area, their removal would certainly have an adverse effect on price competition generally in that market. In other words, in this particular market, there were only two important price competitors of the majors, and the area price discriminations were directed at their practices. In such a situation, the injury to the two independents qualifies as

---

6. At the oral argument, the Court was advised that the Commission has cases in process against other roofing manufacturers. Cf. Universal-Rundle Corp. v. Federal Trade Commission, 352 F.2d 831 (7th Cir. 1965).

7. In the *Volasco* case, the jury rendered a verdict against Fry. A treble judgment was entered for Volasco, and that judgment was affirmed.

injury to competition. Porto Rican American Tobacco Co. of Porto Rico v. American Tobacco Co., 30 F.2d 234 (2nd Cir. 1929), certiorari denied, 279 U.S. 858, 49 S.Ct. 353, 73 L.Ed. 999, is the classic example of this principle. To the same effect, see Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145; Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950 (10th Cir. 1959), certiorari denied, 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727; Maryland Baking Co. v. Federal Trade Commission, 243 F.2d 716 (4th Cir. 1957); E. B. Muller & Co. v. Federal Trade Commission, 142 F.2d 511 (6th Cir. 1944). Selective price reductions by a price leader to punish deviation from an industry price is itself anti-competitive conduct. In such a situation, the actual market results of the price reduction need not be manifest before enforcement of the Act is justified. Note, "Competitive Injury under the Robinson-Patman Act." 74 Harv.L.Rev. 1597, 1602, 1603 (1961).

■ Petitioners urge that there can be no violation of Section 2(a) in area price discrimination cases unless the Commission finds that the higher prices elsewhere support the lower prices in the market under examination. We have been cited to no authoritative decision to support this view. No such requirement was enunciated in Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, or E. B. Muller & Co. v. Federal Trade Commission, 142 F.2d 511 (6th Cir. 1944). Congress and the cases assume that the "higher price to purchasers supports the lower price to others." Austin, Price Discrimination (2nd Revised ed. 1959) p. 44; see also S.Rep.No. 698, 63d Cong. 2d Sess. pp. 2–3 (1914); H.R.Rep.No. 627, 63d Cong., 2d Sess. p. 8 (1914); S.Rep.No. 1502, 74th Cong. 2d Sess. p. 4 (1936), and H.R.Rep. No. 2287, 74th Cong. 2d Sess. p. 8 (1936).

■ Relying upon such cases as Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356 (9th Cir. 1955), certiorari denied, 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856, and Shore Gas and Oil Co., Inc. v. Humble Oil & Refining Co., 224 F. Supp. 922 (D.N.J.1963), Fry asserts there was no violation of the statute because its Knoxville prices were not the proximate cause of injury to Volasco and Ohio. But those were private treble damage actions and there plaintiff must of course establish that defendants caused actual damages to them. In the present case, the statute merely requires that the effect of the discrimination "may be substantially to lessen competition." Moreover, two juries have already found on similar evidence that Fry proximately caused actual damages to Volasco. Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962); idem, 346 F.2d 661 (6th Cir. 1965), certiorari denied, 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157.

### Procedural Issues

■ Fry next argues that the Commission's refusal to permit Fry to subpoena pricing documents from its competitors vitiates the Commission's decision. However, the adverse rulings on the subpoenas were made in the course of interlocutory appeals and were not raised by Fry when the case was finally before the Commission for disposition. Fry should have exhausted its administrative remedy by then complaining of the interlocutory rulings. It is too late to raise the matter now. See United States v. L. A. Tucker Truck Lines, Inc., 344 U.S. 33, 36–37, 73 S.Ct. 67, 97 L.Ed. 54; Moog Industries, Inc. v. Federal Trade Commission, 355 U.S. 411, 413–414, 78 S.Ct. 377, 2 L.Ed.2d 370; 3 Davis Administrative Law Treatise, § 20.06 (1958). In any event, the record discloses no abuse by the Commission in denying the interlocutory appeals, for Fry's competitors had shown that production would be burdensome as to time and expense, would reveal vital business information, could not be accomplished within the requested deadline, and that the request for the issuance of six of the seven subpoenas came too late (10 months after complaint counsel had rested). Being neither arbitrary nor unsupported by the record, the Commission's rulings as

to the subpoenas will not be disturbed on appeal. Cf. Sue v. Chicago Transit Authority, 279 F.2d 416, 419 (7th Cir. 1960).

▇▇▇ Fry also complains of Commission Chairman Dixon's participation in the rulings denying the issuance of subpoenas. At that time, Fry did not request his withdrawal. In the absence of an objection, his withdrawal was not necessitated. Section 7(a) of the Administrative Procedure Act (5 U.S.C. § 1006(a)). When the case reached the Commission for consideration of the merits, Fry for the first time moved that Chairman Dixon disqualify himself and he did so *sua sponte* because he had been counsel to a Senate Judiciary Subcommittee investigating pricing practices of roofing manufacturers. Fry knew of Chairman Dixon's prior role when it had earlier presented to the full Commission its interlocutory appeals with respect to the subpoenas. Its subsequent motion for his disqualification did not complain of his participation in the decision of the interlocutory appeals, nor was any such complaint made when the case came before the Commission for decision on the merits. Since the Commission had no opportunity to consider the matter, it may not be raised here. Unemployment Compensation Commission of Territory of Alaska v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136.

▇▇▇ Petitioners assert that the Commission's order is improper because it joins Messrs. Fry Senior and Junior in their individual capacities. The cease and desist order refers to them "individually and as officers" of Lloyd A. Fry Roofing Company. Complaint counsel twice proposed their inclusion in the order as individuals, without objection by petitioners. The complaint before the Commission named the Messrs. Fry "individually and as officers" of the corporation. It alleged that they were "personally and officially" responsible for the practices assailed. They are Fry's majority stockholders. Petitioners have not challenged the Commission's findings that these two persons formulate and con-trol Fry's practices and were responsible for and participated in these discriminatory practices. In similar situations, we concluded that individuals responsible for corporate activities may be joined in their individual capacities. Steelco Stainless Steel v. Federal Trade Commission, 187 F.2d 693, 697 (7th Cir. 1951); Surf Sales Co. v. Federal Trade Commission, 259 F.2d 744, 747 (7th Cir. 1958). Petitioners rely on Flotill Products Inc. v. Federal Trade Commission, 358 F.2d 224 (9th Cir. 1966), pending on petition for certiorari, No. 668. October Term 1966, but that record did not show the individuals had violated or could be expected to violate the Clayton Act (p. 233). The Ninth Circuit continues to approve the inclusion of individuals in cease and desist orders where, as here, they set the policies and review the practices. Fred Meyer, Inc. v. Federal Trade Commission, 359 F.2d 351, 368 (9th Cir. 1966).

▇▇▇ Finally, petitioners attack the Commission's order on the ground that it fails to lay down a standard between permissible and proscribed conduct. The order requires petitioners to cease and desist from selling asphalt saturated felt "to any purchaser at a price which is lower than the price charged any other purchaser at the same level of distribution, *where such lower price undercuts the lowest price offered to that purchaser by any seller having a substantially smaller annual volume of sales*" of that product (italics supplied). This order was less stringent than proposed by complaint counsel. The Commission modified it to cover only territorial price discrimination that would probably cause the debilitation of smaller and weaker competitors. As Commissioner Elman noted, Fry would probably continue its price tactics unless stopped. This type of order was designed to prevent recurrences of unlawful conduct. It is appropriate because, as he observed, in a market where Fry's price is below its lowest price competitor's, Fry's price is likely to represent another "attempt to discipline an upstart independent." A similar order was affirmed in *Forster Manufactur-*

ing Co. v. Federal Trade Commission, 361 F.2d 340, 343 (1st Cir. 1966, certiorari denied 87 S.Ct. 706). If situations arise to plague petitioners, they may seek binding advice from the Commission as to the applicability of this order. Federal Trade Commission v. Colgate-Palmolive Co., 380 U.S. 374, 394, 85 S.Ct. 1035, 13 L.Ed.2d 904. The order is not to be read as forbidding justifiable area price differences.

The petition will be dismissed. The Commission's order is affirmed.