**NATIONAL DAIRY PRODUCTS COR-PORATION, Petitioner,**

v.

**FEDERAL TRADE COMMISSION, Respondent.**

**No. 16455.**

United States Court of Appeals
Seventh Circuit.

June 20, 1969.

As Corrected June 26, 1969.

John T. Chadwell, Thomas W. Johnston, Richard W. McLaren, Chicago, Ill., William E. Nuessle, Paul Kerins, New York City, for petitioner; Chadwell, Keck, Kayser, Ruggles & McLaren, Chicago, Ill., of counsel.

James McI. Henderson, Gen. Counsel, J. B. Truly, Asst. Gen. Counsel, Daniel H. Hanscom, Atty., F. T. C., Washington, D. C., for respondent.

Before KILEY, and SWYGERT, Circuit Judges, and HOLDER,* District Judge.

---

* District Judge from the United States District Court for the Southern District of Indiana is a member of the panel by designation of the United States Court of Appeals for the Seventh Circuit.

HOLDER, District Judge.

National Dairy Products Corporation filed its petition to review and set aside an order of the Federal Trade Commission. The petitioner was found guilty by the Commission of charges of territorial price discrimination as to its sale by Kraft Foods Division of jelly, jam and preserve (fruit spreads) products in violation of Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. Section 13(a).[1]

Petitioner submits two basic claims of error. It is convinced there was an insufficiency of evidence to support a violation of Section 2(a) of the Act found by the Commission and that there was an unlawful exercise of discretion by respondent as to practices prohibited and the products covered in its final order. The dissenting statement of one of the Commission members agrees with these claims of petitioner.

We affirm the findings and final order of the Commission in all things except as to its inclusion of products, other than fruit spreads, in the prohibitions of the final order which will be so modified.

The petitioner is one of the nation's leading corporate enterprises. It is organized and operates under a division structure consisting of seven operating divisions, each with its own president and staff personnel. Its Kraft Foods Division for many years has extensively

---

1. On December 7, 1962, the Commission issued its complaint which concerned the Section 2(a) violation in the sale of fruit spreads by Kraft Foods Division of petitioner in the Baltimore, Maryland, Washington, D. C., Richmond and Norfolk, Virgina areas. On July 26, 1963, the complaint was amended to include two more charges. One of them concerned a Section 2(a) violation in the sale of Yogurt by the Breakstone Foods Division of petitioner in the New York metropolitan area. The other charge concerned a Section 2(a) violation in the sale of marshmallow topping by Kraft Foods Division of petitioner in the Philadelphia, Pennsylvania, Boston, Massachusetts, and in other New England states areas.

The Hearing Examiner and the Commission found a violation. Four members of the Commission joined in the findings that petitioner violated Section 2(a) as charged as to its sale of fruit spreads and one member filed a dissenting statement. The charges involving yogurt and marshmallow topping were dismissed by the Hearing Examiner and the full Commission upon finding no violation.

Three members of the Commission joined in the cease and desist order, however, one of the three while joining in the order observed in a separate statement as follows: "There are serious limitations in the reach of the order. For example, it has no application in any event to discriminations which may be practiced by the respondent and reflected regularly in its price list. Moreover, even within those limitations, the order may prove difficult to apply because by its terms defenses against the application of the order are accorded the respondent but not provided by law. For example, in the order it is stated:

'* * * `provided, however, that in addition to 2(b) of the statute it shall be a defense in any enforcement proceeding instituted hereunder for respondent (1) to establish that its lower price was the result of a promotional offer involving a price concession which does not undercut the lowest net price and/or the terms and conditions resulting from a promotional offer made to the purchaser receiving the lower price by any seller of a competitive product within the previous 12 months, or (2) to establish that such lower price does not undercut the lowest price concurrently offered generally throughout the same trading area by any other seller of a competitive product having a substantially smaller annual volume of sales of such products than respondent's annual volume of sales of the product on which the discriminatory price was granted.'

Here the Commission had before it a record of evidence showing an abundance of injury to other sellers in the market resulting from the respondent's discrimination in price. * * *, the Commission's order is designed to prohibit only some of such discriminations. In my opinion, what the Commission has done could well be described as an incomplete job." The other two members of the Commission file dissenting statements to the order.

The Commission's opinion is reported in 3 Trade Reg.Rep. ¶18,027 (FTC 1967).

engaged in the business of manufacturing, processing, distributing, and selling many varieties of food products, including cheese and cheese products, margarine, mayonnaise, salad oil, salad dressing, other salad products, caramels, marshmallows, other confections, Kraft Dinners, cooking oils, shortenings, fruit salads, sauces, dessert toppings, condiments, and a complete line of fruit jams, fruit jellies and fruit preserves. It markets such products throughout the United States and in Canada and many foreign countries. It maintains and operates branch sales offices in most of the principal cities of the United States from which its products are sold.

It entered the fruit spread business by acquiring a manufacturer known as Bedford Products, Inc. Bedford was mainly engaged in production of fruit spreads for sale under private labels which were distributed on the eastern seaboard and as far west as Chicago, Illinois. The fruit spreads of like grade and quality were thereafter also manufactured in plants located at Buena Park, California; Garland, Texas; and Dunkirk, New York. In the year 1961, fruit spreads were sold through seventy-one sales offices of the petitioner in the United States. The fruit spreads when sold, except for a short period of time after 1955 were labeled under the name of Kraft and were for the most part distributed directly from such plants to distribution centers of retail outlets. In some instances, smaller shipments were assembled in district branches and then delivered to customer warehouses. Very few sales of fruit spreads were done by store-door delivery sales. By the year 1961, the petitioner had become the largest producer of fruit spreads in the United States, furthermore it is the only nationwide seller of a full line of different flavored spreads. The petitioner heavily advertised its fruit spread products during the 1959–1961 period through the medium of network television, in popular leading consumer magazines, local newspapers, and in wholesale and retail industry publications. During the four year period of 1959 through 1962, its fruit spread volume of sales increased almost sixty per cent, roughly fifteen per cent a year to an annual dollar volume of $16,663,982.-00.

After the petitioner entered the Baltimore, Maryland, Washington, D. C., Richmond and Norfolk, Virginia, market areas in 1956, its fruit spreads along with its other products were promoted by salesmen. In the year 1961, it had fifty-seven salesmen, twenty-seven of whom were based in Baltimore, twenty-five in Washington who also serviced Richmond, and twelve in Norfolk. In the year 1960, its sales of fruit spreads were $40,047.00 in Washington, $317,-793.00 in Baltimore, $31,156.00 in Richmond, and $86,133.00 in Norfolk. Its sales volume so achieved in only four years was comparable to the sales volume of its leading independent regional competitors in such areas even though its prices were higher than its leading independent competitor.

Toward the end of the year 1960, the general office of Kraft Foods Division did not regard its sales volume of fruit spreads as adequate. In particular, it was not satisfied with sales to the leading supermarket chains in the Washington, D.C., area (which, because of their size and competitive positions or situations, overlapped to Baltimore, Norfolk and Richmond). The general office of Kraft Foods Division decided upon an "all out" program to improve sales. It embarked upon a sales promotion which, in substance, provided for the unlimited giving of one case of fruit spread with every case purchased at regular list price by any chain, distributor, retailer, or buying organization in the four areas, commencing January 16, 1961 and ending February 10, 1961. The free goods were to be delivered after February 10, 1961. The net price per unit for goods sold on the basis of one unit given free of charge for each unit purchased at regular price is concluded upon by dividing the regular or list price per unit by two. The net price so resulting (half

of the regular or list price) is substantially below manufacturing cost per case and, if the cost of delivery is taken into consideration, the actual cost to Kraft Foods Division is even greater. All of its customers were notified of the planned major publicity to the retail consumer by means of television and Life magazine advertisements to back up the promotion. It further assured the trade that this promotion would be followed by a continuing program of relatively long duration. The subsequent program called for follow up coupon offers in all of the leading newspapers of the areas, one each in the week of February 13th and March 13th. The first newspaper coupon was to be worth ten cents to a retail customer on a jar of its fruit spread, and the second was to entitle the purchaser to a free jar (10 oz.) with the purchase of a jar of any other variety of Kraft fruit spread. The grocer was to be reimbursed plus two cents for each coupon handled. It further promised the grocery trade a cooperative merchandising agreement would be in effect for two months from February 27th through April 28th. To obtain the allowance under the program, the grocer was required to feature "Kraft" spreads in the store by means of floor or table displays for a period of at least one week during this time. The trade was also advised that four months later (from May 29th through July 28th— some nine weeks), there would be a repeat of the display agreement. The trade was further advised that other promotions will occur to assure rapid turnover of the fruit spread with the reminder that Kraft is the largest producer of fruit spreads in the United States. Point of sale material and instore merchandising assistance by its representatives were also promised the trade.

The response of the trade to the program was massive. The petitioner states it was surprised. The Hearing Examiner and Commission found from the evidence that the response was as should have been expected by petitioner. They found as did the trade that no one engaged in such business could rationally refuse to take full advantage of the opportunity to make money. Thus, the trade took full advantage of an unlimited opportunity to buy a good, well advertised brand name product at half price to the fullest extent of their financial ability and available warehouse capacity. The trade bought uncommonly large quantities.[2] One or two days before the offer period commenced, the petitioner was actually aware of the intent of certain retailers to sell its fruit spreads of half price. Three days after the program was in effect certain retailers began offering the product to the public at half price and others followed with like offers. This quick conversion of the product to cash was one of the means used by the trade to finance their large purchases during the first 26 days of the program after which they would receive an equal quantity of free fruit spreads. Two weeks later petitioner cancelled the planned additional promotional activities of the program but continued the one-free-with-one basis of the program to the end of the 26 day period. Petitioner did some screening of orders in the 26 day period as evidenced by the rejection of one 24,000 case order and an order of unknown quantity late in the period. The Hearing Examiner and the Commission found that such al-

2. The markets' response to the program is indicated by the comparison of petitioner's 27,994 case volume of fruit spread business in January and February of 1960 in the four trade areas with the sales in the same period for 1961 of 400,-803 cases plus the delivery of 153,909 cases at no charge for a total of 554,-712 cases; also by comparing the petitioner's annual volume in the areas for 1960 of 168,977 cases ($475,129.00) against 700,407 cases ($1,740,810.00 ($911,805.00 plus $829,005.00)) for the program year 1961; and a further comparison of petitioner's sales with the annual sales volume of Old Virginia Packing Company, Inc. (petitioner's main "brand name" competitor) in the areas is expressive of the programs response which for the year 1959 were 483,812 cases and in the year 1960 were 518,199 cases.

leged screening was ineffective and inadequate.

The result of the 26 day sale period from January 16, to February 10, 1961 was that petitioner sold and delivered 400,803 cases of fruit spread for $1,519,137.00. The further result of the program occurring after February 10, 1961 was that petitioner delivered 153,909 cases of fruit spreads worth $516,577.00 at no charge to certain purchasers in the 26 day period which preceded February 10, 1961. The total result as to the quantity of fruit spreads reaching the trade was 554,712 cases or 6,656,544 individual jars of fruit spreads. The petitioner did not deliver the balance of the promised free merchandise of 246,894 free cases of fruit spreads. Instead petitioner paid cash to those entitled to such 246,894 cases totalling $829,005.00. The diversion of the program to cash payments in lieu of free goods, petitioner says, was made to avoid the glutting of the market because it was surprised at the response to the program and for the further reason that it was unable to supply the free goods. The Commission rejected petitioner's supply reason. It found that petitioner knew the market was glutted during the 26 day period; knew the Commission had commenced an investigation of the petitioner's practices; and it was not until five weeks thereafter (April) the cash in lieu of free goods diversion of the program was seized upon. The Commission further found petitioner's supply of fruit spreads for the areas in issue was adequate to meet the demand from the program. The finding is supported by the evidence. The petitioner had a substantial inventory of fruit spreads at its Dunkirk plant. Beginning in January 1961, it operated five line production shifts a day on two production lines. The petitioner also expanded the plants production capacity by installation of a third production line that was producing in mid February 1961.

As the marketing plan was carried out, the cost to the petitioner was $1,345,582.00. During the same period of time, petitioner sold its consumer size "Kraft" fruit spreads at substantially higher prices in its other trade areas of the United States. The cost was of necessity subsidized from income and profits earned by petitioner in its operations elsewhere. Petitioner says there is no evidence of such subsidization. The Commission was warranted in inferring that petitioner's losses in the market areas were made up from its treasury in turn obtained from profits from sales elsewhere.

The direct result of petitioner's program was great and damaging losses to its major and other independent competitors.[3] These losses would have been greater and would have had an even more injurious and probable per-

3. The major independent regional competitors and principal packers of fruit spreads in the areas were Old Virginia Packing Company, Inc., Theresa Friedman & Sons, and M. Polaner & Sons. In addition there were other concerns competing to a lesser extent.

The total annual volume in 1960 of petitioner's largest competitor, Old Virginia, was $3,791,931.00 of which 75% consisted of fruit spreads and $1,475,984.00 of which was attributed to sales in the four trade areas. About 30% to 40% of Old Virginia's sales in the areas were to supermarket chains and the balance was to independent grocers. Old Virginia's sales declined from the first half of 1960 in each of the areas during the first six months of 1961 by 23% in the Washington market, by 30% in the Baltimore market, by 41.2% in the Richmond market, and by 35.5% in the Norfolk market. Dollar receipts of Old Virginia fell from $772,022.00 in the first half of 1960 to $558,599.00 in the first half of 1961, a decline of 27.6%. For 1961 Old Virginia's sales declined in the four trade areas from $1,475,984.00 in 1960 to $1,283,482.00. In the first six months of 1961 Old Virginia's net income declined to $2,003.00 from $51,279.00 in the first six months of 1960 and was annually down from $118,823.00 for 1960 to $55,370.00 for 1961. The major and other independent competitors of petitioner incurred similar proportionate losses to that of Old Virginia. The major and other independent competitors of the petitioner also incurred cancellations of orders during the execution of the program.

manent effect on them had the program been consummated as planned. All of this resulted despite the fact that such competitors were aggressive and informed merchandisers. None could meet nor compete with such selling program. The price was below cost of materials alone. The margin of profit of the competition was approximately 10%. The independent competitors of petitioners are traditionally regional, and they are financially unable to compete with such a mass below cost sale.

The Hearing Examiner also found that the petitioner either deliberately intended and was aware that such losses and results would eventuate or, if it did not so intend deliberately and was not so aware, in the exercise of ordinary business judgment, it should have had that awareness and in law, it did have that intent. The Commission was of the conviction that petitioner's program was neither conceived nor conducted as a "promotion" within petitioner's own definition of the term. They were of the opinion that petitioner's program was a price discrimination calculated and intended to destroy and prevent competition (from the independent competitors) in the areas. The very nature of the offer, it said, indicates that it was devised for a predatory purpose. No competitor and no buyer, the evidence disclosed, had ever heard of an offer such as petitioner's program for the sale of a regular brand of fruit spread, even on an introductory basis. Petitioner had been in the market for four years and was not introducing a new product. The Commission further reasoned that it is unreasonable to assume that it was necessary to cut the price of the petitioner's fruit spreads to a below cost price and permit delivery over an extended period of time simply to gain authorization to sell to chain stores. The characterization by petitioner of the program as a "three week" promotion was found completely unrealistic. The offer on its face was set up as a part of a program to extend for a six month period. The only limitation as to the amount a purchaser could buy at half price was the amount it chose to finance and warehouse. Another factor considered by the Commission in establishing petitioner's intent is the prices which existed in the four areas prior to the order. Its prices were substantially higher than the major independent competitor. Had petitioner's only purpose been to obtain chain store authorizations,[4] it could properly have reduced its prices to meet those of its regional competitors and there was evidence to this effect. Still another factor considered by the Commission in establishing such intent was that petitioner could have reasonably foreseen the consequences of its offer. Petitioner is a knowledgeable and experienced marketer of fruit spreads and other food items through its Kraft Foods Division with four years experience in the four trade areas. The Commission found it used the four years experience in the areas by its marketing division as well as the experience of its field personnel in devising the offer. Moreover, it held, in the previous year, petitioner's Kraft Foods Division had instituted a similar promotion in the Boston area in the sale of marshmallow cream. Despite the fact that this product has primarily a seasonal demand and less storage capability than fruit spreads, the Kraft Foods Division was forced to curtail shipments to other areas because of the unprecedented demand for that product. Additionally, the Commission found that an admission of a representative of Kraft Foods Division when the offer was initiated indicated the consequences upon the independent competitors were readily apparent. The Commission also held that the petitioner's actions subsequent to the initiation of its program fully support a finding that its purpose was to injure and prevent competition. It reasoned that the petitioner's evidence is

---

4. The word "authorization" has a technical meaning. No vendor can sell his goods in a chain store unless the manager thereof is authorized in advance to stock the same by his principal.

vague and inconclusive and unsupported by any documentary evidence of its alleged efforts to screen and limit orders after January 19, 1961 when the retailers cut the price of the fruit spread to consumers in half.

■ Pertinent portions of Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act (15 U.S.C. Section 13(a)) are:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, whether either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia * * *, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

An objective of Section 2(a) is to prevent discriminatory practices of manufacturers and to shield their competitors therefrom. The Supreme Court, in Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, at page 543, 80 S.Ct. 1267, 1271, 4 L.Ed.2d 1385 (1960) so observed in stating its conclusions as to the legislative history of Section 2(a):

"The section, when originally enacted as part of the Clayton Act in 1914, was born of a desire by Congress to curb the use by financially powerful corporations of localized price cutting tactics which had gravely impaired the competitive position of other sellers."

■ We believe the Commission correctly found a violation of this Act.

Petitioner asserts that the key issue in the appeal is whether the predatory intent finding of the Commission is supported in law and in fact. This is so, it further urges, because without such intent there is no evidence of competitive injury sufficient to support the Commission's order. Specifically, it charges the Commission excused itself from making a close study of market facts otherwise required in primary-line cases in order to assess whether there is actual proof that the price differential had the specified adverse effect on competition. The Commission solely relied, petitioner contends, on its predatory intent finding and its findings of injury to a competitor.[5]

We are unable to agree with the petitioner's elevation of predatory intent in the case to that of the key issue. The record discloses the Commission made a study of the market, including petitioner's share thereof, which was more than

5. Lloyd A. Fry Roofing Company v. Federal Trade Commission, 371 F.2d 277, 281 (7 CA 1966), cited by petitioner clearly points out petitioner's position:

"* * * territorial price differences are not invalid *per se*, for the statute requires that there be a reasonable probability of injury to competition. Injury to a competitor is not the test; the test is *injury to competition*. In most primary line cases under this statute, a violation cannot be established without a close study of the market, including data as to the discriminator's share of the market. However, in cases of predatory intent, 'injury to even a single competitor should bring the Act into play'. Attorney General's National Committee to Study the Antitrust Laws (1955) p. 165; Rowe, Price Discrimination under the Robinson-Patman Act (1962) pp. 145, 149. An intent to harm competitors distinguishes anticompetitive price cutting from competitive activity not meant to be prohibited per se by the Robinson-Patman Act. An illicit intent serves to show the substantiality and probability of the competitive effects that may result from the price reductions. If, as here, the price reductions are substantial and prolonged, it is proper to invoke the statute to curb the discriminatory pricing. * * *."

adequate under the circumstances. If found therefrom that there was in fact a reasonable probability of injury to competition. If the study was adequate and such finding is proper, then predatory intent is not the decisive issue. See Armour and Company v. United States, 402 F.2d 712, 717 (7 CA 1968). A discussion of the predatory intent issue will be deferred for a look at the equally valid market study method of proof of injury to competition as used by the Commission.

## MARKET STUDY

The extent of a market study necessary to support a finding of injury to competition of practical necessity will vary in a case to case basis. The circumstances and record evidence present in this case clearly depict the sufficiency of the market study made by the Commission.

In early March 1961 (during the promotion), the Commission commenced its investigation. It requested and obtained extensive information from petitioner. The record contains detailed and complete sales statistics. Month-by-month sales comparisons for three years commencing in January 1959 for each of the four trade areas for Old Virginia and for Theresa Friedman. For Polaner, sales figures for three years by six months periods are in the record, and month-by-month data for the first six months of 1960 and 1961 is available. Additionally, detailed data showing sales on a monthly basis of such three competitors to a large number of selected customers in all four metropolitan areas in the years 1960 and 1961 were presented. Also charts were received showing Old Virginia sales, both by consecutive and comparable six months periods, for the three years from January 1959 through December 1961 and before and after promotional allowances. In addition, comparisons of fruit spread purchases by leading buyers from various suppliers including Kraft, Old Virginia, Welch, Garner, Polaner and others are available. Complete data of the petitioner's

participation in the market was before the Commission.

The petitioner contends the Commission's market study was insufficient as the record does not include market data of some 72 other fruit spread manufacturers in the four trade areas who marketed 130 or more separate brands. The fact is, that apart from competition given petitioner by chain store private label fruit spreads, its major competitors were Old Virginia and Polaner and they may be classed as regional producers. Some other regional producers competing in these areas were Theresa Friedman, T. W. Garner Food Company, and C. H. Musselman Company (now a division of Pet Milk Company). It is a historical characteristic of the fruit spread industry that the leading competitors are regional. Data of sales losses resulting from petitioner's program were not limited to the foregoing three leading regional competitors. Garner suffered a decline comparable to the three competitors. Sales of Garner's fruit spreads in the Norfolk area were 60% less in the first three months of 1961 than its sales for the same period of 1960. Also in the Richmond area sales of fruit spreads to Richmond Food Stores by the America Preserve Company decreased in the same periods from $17,507.00 to $6,451.00. C. H. Musselman Company's sales in the Richmond area to Richmond Food Stores decreased in the same period from $13,363.00 to $2,399.00. Buyers and brokers for various stores testified to the substantial decline in the sales of all brands of fruit spreads competing with petitioner for periods of three months to as much as twelve months. One purchaser in the Washington area still had 500 cases of Kraft's fruit spreads purchased in the 1961 program in December of 1963 at which time it reduced its prices thereon to move it out of its warehouse. Another purchaser in Norfolk who had purchased 13,180 cases from Kraft in the 1961 program made no further purchases from a competitor of petitioner until March of 1962. Welch Grape Juice Company which mar-

kets one flavor (grape) throughout the country and J. M. Smucker Company which has national or quasi national distribution of fruit spreads are petitioner's only semblance of nation wide independent competitors. The record also contains the petitioner's own market survey of shelf space occupied by fruit spread brands of all competitors in the four market areas. Petitioner admits that shelf space is generally of the same order of magnitude as shares of sales. This survey discloses:

| MANUFACTURER | PER CENT OF TOTAL SHELF FACING IN ALL FOUR MARKET AREAS |
| --- | --- |
| Old Virginia | 15.8% |
| Theresa Friedman | 11.9% |
| Polaner | 6.1% |
| Kraft | 5.9% |
| Ann Page (chain) | 10.2% |
| Empress (chain) | 6.2% |
| Welch | 7.3% |
| Smucker | .8% |
| Garner | .9% |
| Louis Sherry | 1.8% |
| Crosse & Blackwell | 3.1% |
| Mott | .6% |
| White House | 2.2% |
| Musselman | 2.3% |

The other shares of the sixty-one competitors in the remaining market of 24-9% were comparable to the last six manufacturers. The chain's private brands had 16.4% of the shelf spacings and the three major independent competitors together with petitioners possessed 39.7% of the remaining 83.6% of the shelf space in the market areas. The petitioner admittedly was buying shelf space and the acquisition of shelf space from another competitor is tantamount to increase in sales to the acquirer and a reduction to competitors.

Any further study would have unduly complicated the Commission's proceeding and was impracticable under the circumstances. The Hearing Examiner and the Commission were justified upon the record before them in not going to undue corroboration of the already ade-

quate record. It was unnecessary to produce all of the data of all competitors and equally unnecessary to make detailed further findings from the evidence as to such other competitors. We concluded that a close study was made of the market. The Commission finding therefrom that if the three competitors were unable to compete not because of a want of executive ability but due to petitioner's below cost offer, the competitive ability of the other sellers would be likewise impaired.

### INJURY TO COMPETITION (INCIPIENCY TEST)

The element of injury to competition will be first considered under the "incipiency" test for violation of the Act. In doing so the planned program must be reviewed without regard to the petitioner's diversion from the program in execution thereof as to whether the probable effect thereof "may be" substantially to lessen competition. Later consideration will be given to the actual effect of the program. Actual injury and permanent loss of sales to competitors of a violator of the Act need not be proved although such facts are evidentiary support thereof. In Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 738 (1945), 65 S.Ct. 961, 967, 89 L.Ed. 1320 (1945), the court stated the principle:

> "* * * § 2(a) does not require a finding that the discriminations in price have in fact had an adverse effect on competition. The statute is designed to reach such discriminations 'in their incipiency', before the harm to competition is effected. It is enough that they 'may' have the proscribed effect."

This court has repeatedly recognized this governing consideration. E. Edelmann & Co. v. Federal Trade Commission, 239 F.2d 152, 154 (7 CA 1956), cert. denied 355 U.S. 941, 78 S.Ct. 426, 2 L.Ed.2d 422 (1958); National Lead Company v. Federal Trade Commission, 227 F.2d 825, 835 (7 CA 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct.

502, 1 L.Ed.2d 438 (1957); Purolator Products, Inc. v. Federal Trade Commission, 352 F.2d 874, 881 (7 CA 1965); United Biscuit Company of America v. Federal Trade Commission, 350 F.2d 615, 620 (7 CA 1965), cert. denied 383 U.S. 926, 86 S.Ct. 930, 15 L.Ed.2d 845 (1966).

The petitioner concluded, much like a violator in the case of Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 698 (1967), 87 S.Ct. 1326, 18 L.Ed.2d 406, that it was not achieving adequate distribution of its product in the Washington area. The problem with which Kraft was confronted was its alleged inability to obtain authorizations in three leading chain stores. The chains, it had concluded, ran about 90% of the volume and without the authorizations in such chains Kraft could not have this business. Petitioner felt that its massive advertising as far as these areas were concerned was wasted. In early 1960, it submitted a program to two of the Washington chains which was rejected. The tendered program provided for payment of promotional allowances on two occasions over a ten month period and was limited to four varieties of fruit spreads. The evidence supports the Commission's finding that petitioner's share of the four trade areas after four years of experience was earned and fair. Its failure to achieve higher sales was evidently for valid reasons and such market action was "rational". Under the circumstances its regular selling prices were not competitive. So far as the record shows, to the extent the products of petitioner were not authorized for the chains, it was because they were regarded as being overpriced. There is no reason of record to suppose that authorizations could not have been obtained simply by reducing prices to the level of its competitors.

The petitioner then conceived the program, the details of which need not be recited again, with the alleged purpose of gaining such authorizations. Before executing the program, petitioner extended it to other areas because of overlapping market areas. The program so conceived was represented to the trade as extending over the period of six months and would be supplemented thereafter. The heart of the program was the 26 day offer of its fruit spreads at its regular prices and matching free of charge for delivery thereafter all of the fruit spreads purchased in the 26 day period. Petitioner placed no limit upon the quantity the trade could purchase in the 26 day period. Thus, the trade could purchase the enormous quantities of fruit spreads that their finances and warehousing would permit. It was also known to petitioner that it could not restrict any reduction in sales price to the ultimate consumer. Such price reduction could reasonably have been foreseen as a method of the trade's financing the purchase of petitioner's products. Thus, it was reasonably foreseeable to petitioner that its fruit spreads would glut the market and substantially affect competition for a long period of time both as to price and sales. The recited facts concerning the relative economic strength of the petitioner and the regional competitors in the areas is also a relevant factor in determining whether the effect of such program may be to substantially lessen competition. See Atlas Building Products Co. v. Diamond Block & Gravel Co., 269 F.2d 950, 956–957 (10 CA 1959), cert. denied 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727 (1960); H. J. Heinz Company v. Beech-Nut Life Savers, Inc., 181 F.Supp. 452, 464 (S.D.N.Y.1960). If we accept the program's purpose as petitioner suggests as not being tainted with predatory intent, then we must also accept its suggestion that it was buying shelf space. Any shelf space it acquired had to be taken away from its competitors. The Hearing Examiner found that a modern grocery store has a limited amount of shelf space and increased stocking of petitioner's fruit spreads had to result in a decrease or complete elimination of space allocated to a competing brand. It is further obvious that the shelf space of the chains' private

brands would not be diminished under the program. In substance, the chains were being paid "push money" to advance the sale of petitioner's fruit spreads over the sales of those of its competitors. See Federal Trade Commission H. R. Report Number 631, page 3, 67th Congress, 2nd Session; American Distilling Co. v. Wisconsin Liquor Co., 104 F.2d 582, 585 (7 CA 1939).

Faced with such a program in its inception it is unrealistic to believe that any of the many small regional competitors, or for that matter any of the larger regional competitors, could by any conceivable promotion compete with petitioner. No competing price promotion was conceivable because of their financial inability to meet petitioner's price. Without such power to compete under these circumstances, then there can be no other conclusion but that there was the reasonable probability that injury to competition would result for at least six months and for some unknown time thereafter. Thus, by viewing the competitive market as it probably would have been affected at the inception of the execution of the program, we agree with the Commission that there would be substantial injury to competition and an erosion of competition.

Petitioner urges that the program was of such short duration that in executing it there would have been only a temporary diversion or shift of sales to achieve a lawful objective of competing in the chains. Petitioner also urges that the Commission indulged in conjecture as to the probability of its launching any other like future programs. We agree with the Commission that the program as planned in its incipiency was for a substantial period of time. Furthermore, the Commission's findings as to the substantial duration and the probability that competition may be substantially injured and lessened is supported by substantial evidence and binding on review. See Universal Camera Corp. v. National Labor Relations Board, 340 U. S. 474, 488 (1951), 71 S.Ct. 456, 95 L. Ed. 465; Federal Trade Commission v. Pacific States Paper Trade Ass'n., 273 U.S. 52, 63 (1927), 47 S.Ct. 255, 71 L. Ed. 534; Corn Products Refining Company v. Federal Trade Commission, 324 U.S. 726, 739 (1945), 65 S.Ct. 961, 89 L.Ed. 1320. This principle is particularly pertinent to the Commission's findings as to injury to competition, an area that is peculiarly within the competence of the Commission. See National Lead Co. v. Federal Trade Commission, 227 F.2d 825, 837 (7 CA 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502 (1957); Foremost Dairies, Inc. v. Federal Trade Commission, 348 F.2d 674, 676 (7 CA 1965) cert. denied 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362; E. Edelmann & Co. v. Federal Trade Commission, 239 F.2d 152, 154 (7 CA 1956), cert. denied 355 U.S. 941, 78 S.Ct. 426 (1958). The Commission correctly commented when pressed with the same argument of petitioner:

"* * *. We would be derelict in our responsibility under the law to hold that promotions as such can never be within the compass of Section 2(a). To do so would enable marketers to take short-range bites at the competitive apple which could have just as injurious an effect on competition as overt price cuts. It is obvious that the seriatim use of promotions or the use of a single promotion whose impact or design extends over a significant period of time can have as devastating an effect on market structure as any overt price cut which frequently is also of a temporary nature and certainly has no inherent sustained duration."

The Supreme Court has likewise observed in the case of Moore v. Mead's Fine Bread Co., 348 U.S. 115, 119 (1954), 75 S.Ct. 148, 150, 99 L.Ed. 145:

"* * *. If this method of competition were approved, the pattern for growth of monopoly would be simple."

The incipiency test is more reliable under the circumstances of the case. The recited facts disclose diversions from the program by petitioner. This occurred after the market became glut-

ted by reason of the program and after the commencement of an investigation by the Federal Trade Commission in March. The diversion changed the effect upon the market to some extent thus distorting the effects of the planned program and the future plans although there is evidence of its effects several years later. Absent such interference by the Federal Trade Commission and the diversion, no one will ever know with accuracy what the full effect of the program would have been and what the follow up programs of petitioner would have been after the six month planned program in issue had expired. Thus, the past conduct of petitioner is relevant to determine the future. We find no merit in petitioner's claim that the Commission's reference to future programs was based on speculation. The Commission based its judgment in this regard upon proven facts in a massive record of petitioner's actual business conduct in below cost selling. Every cease and desist order must entail an estimate of the future, and this must be grounded on past conduct. See Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 703 (1967), 87 S.Ct. 1326, 18 L.Ed. 2d 406.

## INJURY TO COMPETITION VIEWED AFTER THE PROGRAM

The petitioner received the purchased shelf space for its fruit spreads in the chain supermarkets. It also acquired more shelf space than it had before the program in the independent stores. The shelf space of the competitors of petitioner was reduced. The competitors of the petitioner were unable financially to compete for such shelf space or otherwise engage in a competing promotion. The loss of shelf space has a direct relation to volume of sales and competition was thus lessened. The massive sales of fruit spreads during the first 26 days of the program and the great quantity of free distribution of fruit spreads thereafter actually delivered glutted the market areas. Thus, the shelf spacing preference was continued thereafter to move the products.

The competitors making up petitioner's existing competition in the areas incurred substantial losses in sales. The details of these losses have been reviewed and need not be repeated. Old Virginia's sales were reduced by 23% to 41.2% in the first six months period of 1961 from a like period in 1960 and dollar receipts fell from $772,022.00 to $558,599.00 (a decline of 27.6%). Its net income during this same period fell to $2,003.00 from $51,279.00 and annually compared, fell to $55,370.00 from $118,-823.00. Its gross annual sales fell from $1,475,984.00 to $1,283,482.00. Other major and lesser competitors experienced similar proportionate losses. Competitors also incurred cancellations of orders during the period program. Tail ending effects upon orders of competitors from the glutting of the market by petitioner are recorded as late as December of 1963.

The actual results of the program under the circumstances of this case represents a substantial competitive injury within the meaning of Section 2(a) of the Act.

We disagree, as did the Commission, with petitioner's claim that this damage to its competitors was temporary, that a mere shift or diversion of sales was involved, and that the three major independent competitors showed little or no ill effects from the program and therefore, no basis exists for finding substantial injury to competition violative of Section 2(a). There is no provision in the statute which makes the length of time of a territorial price discrimination a per se criterion in determining legality of such a practice. It is the effect upon competition that must be shown before there is a violation and it must be substantial or that there is a reasonable probability that it may be substantial. See Borden Co. v. Federal Trade Commission, 339 F.2d 953, 956 (7 CA 1964); Forster Mfg. Co. v. Federal Trade Commission, 335 F.2d 47 (1 CA 1964), cert. denied 380 U.S. 906, 85 S.Ct. 887, 13 L.Ed.2d 794 (1965); Utah Pie Co. v. Continental Baking Co., 386 U.S.

685, 87 S.Ct. 1326, 18 L.Ed.2d 406. Competition was lessened drastically for at least six months or more and thereafter to a certain extent was lessened for some time. The program not only diverted sales of competitors but made it impossible to compete with petitioner for the market. This is so because of the nature of the program as to below cost pricing, unlimited as to quantity of purchasing, and other attendant factors in the program of six months duration. Nothing prevented the trade from purchasing one month to a year or more supply of fruit spreads although a feeble and ineffective effort was made by petitioner during the 26 day period to screen orders. Strong existing competition was rendered helpless to compete with the below cost pricing as the competitors were not the financial equal of the petitioner. Aside from the actual substantial lessening of competition for such a substantial period of time there was the reasonable probability based upon substantial facts that the duration of such damage to competitors would be even greater. The timely interference of the Federal Trade Commission investigation of petitioner's program brought about a drastic change in the program five weeks later which prevented greater destruction of a substantial segment of competition in the areas.

## PREDATORY INTENT

 We have previously observed that predatory intent is not the key issue as the Commission's market study and its finding of actual injury to competition from the program was sufficient to the determination of a Section 2(a) violation. The petitioner has devoted much of its brief to the issue of predatory intent. Because such intent may or may not corroborate the found violation of Section 2(a) and the effect it may have upon the challenged cease and desist order, the issue will be reviewed. Such intent is not essential for a finding of the violation of Section 2(a) in this primary line case. See Utah Pie Company v. Continental Bak-

ing Co., 386 U.S. 685, 698–700, 702–703, 87 S.Ct. 1326, 18 L.Ed.2d 406; Lloyd A. Fry Roofing Co. v. Federal Trade Commission, 371 F.2d 277, 281–282 (7 CA 1966); Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356, 369 (9 CA 1955); and H. J. Heinz Company v. Beech-Nut Life Savers, Inc., 181 F.Supp. 452, 465 (S.D.N.Y.1960).

The record also substantially supports the findings of the Commission of the predatory purpose of petitioner's program to injure competition. Literal proof of actual intent is seldom attainble. Resort must therefore and usually is made, in proving predatory intent, to the legally acceptable inference thereof from the direct and circumstantial evidence. Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 552 (1960); 80 S.Ct. 1267, 4 L.Ed.2d 1385; Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 696, 87 S.Ct. 1326, 18 L. Ed.2d 406; and Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 843 (7 CA 1961). We believe the Commission, was warranted in finding that the petitioner failed to use its competitive power fairly, nor did it exercise proper restraint thereof in the market place, and failed to respect the rights of its competitors.

In arriving at the finding of predatory intent, the sum total of all of the evidence must be considered. The facts have been detailed and will not be repeated. The following capsule review of certain of the pertinent facts will point up the firm basis for the finding made by the Commission of predatory intent: The actual experience in and the extensive research made of the market areas by the petitioner before it prepared and launched the program; its knowledge of its competitors and the comparable financial strength of it to its competitors obtained from such experience and research; the substantially higher pricing of its products over that of all competitors in the areas; its inability to gain authorizations in three major chain stores merely with its massive advertising because of its high prices; its knowl-

edge that the competitors could not financially or otherwise compete with a below cost and unlimited quantity offer; its knowledge from a prior offer of its marshmallow product (a seasonally used new product) in a similar program in the Boston, Massachusetts, area which glutted that market; its knowledge that it could not control the quantity of purchases; its knowledge that to gain shelf space in such chains meant no reduction in the shelf space of the private brands of the chains but would reduce the space of the independent competitors; it was advised by a competitor before the program went into effect that competition would be seriously harmed by the program by reduction of shelf space, orders and sales of its competitors; after effecting the program its failure to adequately, if not refusal to control the quantity of sales during the 26 day period; the gearing of its production plant long in advance for a massive sale; the delay of five weeks after it had knowledge that the market was glutted and that the Federal Trade Commission was investigating the program before it curtailed the distribution of part of the free goods;[6] its admission that it was going all out to get the authorizations; its knowledge that the program had to and would include the entire trade in the four areas and not be limited to the three chains; its knowledge that the product offered was a premium product bearing a name with which the public was intimately acquainted; the offer of this class of merchandise was unheard of to the trade; and the resulting purchases were reasonable to foresee under the circumstances to a reasonably prudent manufacturer.[7] The Commission was warranted in finding that petitioner undertook an all out program, not caring what the effect would be on local competition and, in fact, fully intended to damage its competition. The petitioner indulged in an extravagant drastic below cost program and it would require a long time to recover its losses of $1,356,089.00 so sustained locally. See Armour and Co. v. United States, 402 F.2d 712, 719 (7 CA 1968). It wanted authorizations but its program also infers that it was aimed at competition.[8]

The previously reviewed facts we believe convincingly presented the issue of predation to the Commission and supports its finding. See Moore v. Mead's Fine Bread Co., 348 U.S. 115 (1954), 75

6. There was a high state of fruit spread inventory at its Dunkirk plant two weeks before the start of the program. This plant supplied the four trade areas. About six months before the program was to commence, petitioner planned to add a third production line and was scheduled for completion by February 1, 1961 with full three line production two to three weeks later. It planned five line shifts a day beginning in January 1961 which required use of every available storage place in the plant. It declared such plans were in order to build inventories to take care of February and March of 1961 shipments. The Commission after weighing the evidence found petitioner specifically timed its offer to coincide with the added production. It rejected conflicting evidence and inferences of petitioner's contentions that such high inventory was due to the expectancy of a general increase in sales in 1961, or that the inventory was actually low in view of sales expectancy, and the expectancy of a plant shut down in January 1961.

7. Fruit spreads are a basic item on the shelves of the retailer. They are a staple item of food. Petitioner's fruit spreads could not be equated with like offers of scouring powder, deodorant spray, barbeque sauce, dried potatoes, diaper pure, mustard, floor wax, horseradish sauce, slaw dressing, liver and iron tablets, dog chow, white plates, wool wash and like merchandise as petitioner suggests. The promotions of part of these products were not admitted into evidence by the Hearing Examiner and petitioner has claimed no error yet it has referred to them.

8. In the first five months of 1960, petitioner spent $11,565.00 and in 1961 spent $1,356,089.00 in the four trade areas. In fact, it spent in 1961 promotions only $289,264.00 in all of its Eastern Division, $187,504.00 in its Central Division, and $65,555.00 in the eastern part of the Southern Division, which comprised the major portion of the United States.

S.Ct. 148, 99 L.Ed. 145; Maryland Baking Co. v. Federal Trade Commission, 243 F.2d 716 (4 CA 1957); H. J. Heinz Company v. Beech-Nut Life Savers, Inc., 181 F.Supp. 452, 464 (S.D.N.Y.1960); Federal Trade Commission v. Anheuser-Busch, Inc., 363 U.S. 536, 552 (1960), 80 S.Ct. 1267, 4 L.Ed.2d 1385; Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 696, n.12, 87 S.Ct. 1326, 18 L.Ed.2d 406; Dean Milk Company v. Federal Trade Commission, 395 F.2d 696, 707–708 (7 CA 1968); and Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 843 (7 CA 1961).

## CONFLICTING EVIDENCE

■ Many of petitioner's claims of error are misplaced in that it seeks to have this court in review to weigh the conflicting evidence and substitute our findings of facts for those of the Commission. This we cannot do as there is substantial evidence to support the Commission's findings. 15 U.S.C. § 21(c); see Stauffer Laboratories, Inc. v. Federal Trade Commission, 343 F.2d 75, 79–80 (9 CA 1965); Federal Trade Commission, v. Algoma Lumber Co., 291 U.S. 67, 73 (1934), 54 S.Ct. 315, 78 L.Ed. 655; Fort Howard Paper Co. v. Federal Trade Commission, 156 F.2d 899, 906–907 (7 CA 1946), cert. denied 329 U.S. 795, 67 S.Ct. 481, 91 L.Ed. 680; Federal Trade Commission v. Pacific States Paper Trade Ass'n., 273 U.S. 52 (1927), 47 S.Ct. 255, 71 L.Ed. 534; Independent Grocers A.D. Co. v. Federal Trade Commission, 203 F.2d 941, 945 (7 CA 1953); National Macaroni Manufacturers Ass'n. v. Federal Trade Commission, 345 F.2d 421, 426 (7 CA 1965); Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488 (1951), 71 S.Ct. 456, 95 L.Ed. 456; Federal Trade Commission v. Pacific States Paper Trade Ass'n., 273 U.S. 52, 63 (1927), 47 S.Ct. 255, 71 L.Ed. 534; Corn Products Refining Company v. Federal Trade Commission, 324 U.S. 726, 739 (1945), 65 S.Ct. 961, 89 L.Ed. 1320; National Lead Co. v. Federal Trade Commission, 227 F.2d 825, 837 (7 CA 1955), rev'd on other grounds, 352 U.S. 419 (1957), 77 S.Ct. 502, 1 L.Ed.2d 438; Foremost Dairies, Inc. v. Federal Trade Commission, 348 F.2d 674, 676 (7 CA 1965), cert. denied 382 U.S. 959, 86 S.Ct. 435; E. Edelmann & Co. v. Federal Trade Commission, 239 F.2d 152, 154 (7 CA 1956), cert. denied 355 U.S. 941, 78 S.Ct. 426 (1958); Standard Distributors, Inc. v. Federal Trade Commission, 211 F.2d 7, 12 (2 CA 1954); and Lloyd A. Fry Roofing Co. v. Federal Trade Commission, 371 F.2d 277, 284 (7 CA 1966). Some examples of petitioner's references to evidence which it urges upon the court were indeed in conflict with other substantial evidence are recounted: It dubs the program as a "limited 26-day free goods offer of a type commonly found in the food industry", whereas the Commission found from other facts in evidence that the program was intended for a six months duration; it refers to the loss to its competitors as mere temporary diversion of sales from three of its seventy-five competitors, whereas the Commission found from substantial evidence that all competition was injured and this injury lasted for over six months time and probably would have had a permanent effect on competition but for its intervention in March of 1961;[9] it asserts that the sole evidence

9. Petitioner relies upon the dissenting Commissioner's statement in summarizing the Commission's majority prediction that it is safe for a national seller to engage in such competitive promotions, but only up to the point where they do not succeed in diverting sales from other competitors and then boldly urging that this turns the antitrust laws upside down. The petitioner's use of such conclusion ignores the weight of the evidence which supports the Commission's findings. The false premise from which the petitioner's borrowed conclusion is drawn is from the assumption or finding of the dissenting Commissioner that petitioner was engaged in a competitive promotion. The weight of the evidence is to the contrary. The fact is that petitioner's offer was unlimited. It was drastically below actual and constructive cost and all of the trade could buy all the fruit spread they could pay for and warehouse during a certain period of time. It was possible for and

of its purpose in launching the program was to obtain authorizations yet the Commission found substantial evidence from which it was entitled to infer that petitioner knowingly intended to harm competition; it asserts the four trade areas were new markets for petitioner whereas the evidence is that it had been in that market for four years and in such time became one of the leaders in volume of sales; it claimed the volume of sales produced by the program was a surprise and was unanticipated yet there is substantial evidence that petitioner knew in advance and again in the early stages of the massive response and it did little or nothing to curtail such sales until five weeks after the Federal Trade Commission commenced its investigation and after the market was glutted; it claimed there was no way for it to get authorization except by this program, yet the evidence supports the Commission's finding that the petitioner was highly successful in the four trade areas in four years, even though its products were priced higher than its competition's products and no reasonable effort was made to compete with a fair price for such authorizations; it contends that the competitors' losses were due to their own special problems and failure to compete with any promotions of their own, whereas the Commission found facts which support its ultimate finding that petitioner's competitors were aggressive, informed merchandisers with nothing critically wrong or inept about their activities and that they could not compete with petitioner; it takes issue with the Commission's finding that petitioner's loss incurred in the program was subsidized by its sales at its regular prices in other areas, whereas the Commission was supported by the evidence that such losses could not have been supported from profits from petitioner's sales in the past and for any reasonable time in the future in the four trade areas and such losses had to be financed from the petitioner's treasury; it contends the Commission was inconsistent in finding no violation of Section 2(a) by petitioner's similar program pertaining to its products of marshmallow topping and yogurt,[10] whereas the facts disclose they are entirely different classes of goods than fruit spreads, and further that the marshmallow product program was a seasonal and sectional product newly introduced to the market and the yogurt product was sectional and the programs did not lessen competition substantially or tend to create a monopoly nor did they injure, destroy or prevent competition; and it takes issue with the Commission's reference to the

probable that the trade would stock the fruit spreads of sufficient quantity for use in the future and for a long period of time. This practice cannot be classed as competition. It was unfair competition and a monopolistic program which shut out all competition for the market.

10. Petitioner ignores the evidence supporting the Commission's ruling and stresses the dissenting Commissioner's statement that the Commission majority's discussion and reasoning in distinguishing the fruit spread from the marshmallow topping promotion were "baffling and unexplained". In each such dissenting Commissioner insisted, the shift of sales from competitors to petitioner did not show that the promotion was unfair or that competition was injured. We believe the dissenting Commissioner's observation is not based on fact or upon good legal reasoning. The facts of the marshmallow topping program were unlike those of the fruit spread program of petitioner and an entirely different principal of law governs the conduct of petitioner. The marshmallow topping was a new product for which it sought chain store authorizations with a one-case-free-for-each-two purchased over a 30 day period. The principal New England competitor had 92% of the market and the second and third competitors divided a large part of the rest. All three competitors lost business. A new entrant into a local market legally has the greatest latitude to sell there at prices lower than it charges elsewhere. The supporting reason for such under these facts is that there is more competition when a new force enters a market. We fail to find the inconsistency in the ultimate judgment of the Commission dealing with the fruit spread violation and the dismissing of the marshmallow topping violation.

Dunkirk plant of petitioner's massive overproduction and warehousing program for six months before launching the sale in contemplation of the massive response of the trade, yet there is substantial evidence from which the Commission did conclude such as being a part of the sale in issue.

The petitioner in urging such conflicting evidence cites cases as authority for its claim that the Commission should have made findings based on such evidence and thereby absolve it of the charged violation. We have examined the authorities and agree with their holdings but cannot agree that they are in point under the facts and circumstances of this case.

The program of petitioner is in no way comparable with the mere shift of business between competitors as found in Anheuser-Busch, Inc. v. Federal Trade Commission, 289 F.2d 835, 840 (7 CA 1961). Anheuser-Busch did not undercut competitors' prices as did the petitioner, but merely met its competitors' prices. That case presented no facts of radical below cost sales in the market area involved which factor is present in petitioner's program and consequently there was no loss to be subsidized from sales in other market areas. The effort of petitioner to compare the facts in the case of Minneapolis-Honeywell Reg. Co. v. Federal Trade Commission, 191 F.2d 786 (7 CA 1951) with this record cannot withstand scrutiny. In that case a standard quantity discount system was the sole accused illegal practice. There was no selling below cost and no undercutting of competitors' prices which factors are present in petitioner's program. Actually competitors of Minneapolis-Honeywell increased their sales and new competitors entered the market and succeeded in establishing sound business concerns. Wholly unlike the four trade areas in which petitioner launched its six months program containing about 6,000,000 people and which constituted the major markets of petitioner's competitors is the trade area involved in the case of Borden Co. v. Federal Trade

Commission, 339 F.2d 953 (7 CA 1964). In that case the injury to primary line competition by Borden was a one week discrimination in an Ohio town with a population of 2,500. Equally misplaced is the reliance of petitioner upon the case of American Oil Co. v. Federal Trade Commission, 325 F.2d 101 (7 CA 1963). This case was a secondary-line charged violation. All customers were comparable retail gasoline stations. The typical shift of business amounted to $50.00 in gross profit, and there was no causal relation established between the discrimination and the injury. The petitioner also misstates the holding in the case of Utah Pie Co. v. Continental Baking Company, 386 U.S. 685, 699 (1967), 87 S.Ct. 1326, 18 L.Ed.2d 406. Petitioner infers that since sales losses were not sustained by Utah Pie Co. the Supreme Court impliedly approved argument that losses of local competitors caused by area price cutting do not constitute injury to competition. The specific holding is that the jury was entitled to consider the sales losses which Utah Pie would have sustained, had it not reduced its prices to meet Continental's in deciding whether or not Continental's local price cut had the capacity to substantially lessen competition in violation of Section 2(a). Furthermore, petitioner does not impress the court with the suggestion that the holding in such case implies that direct and literal proof of actual intent to injure competitors to prove predatory intent is required. The holding was that such purpose may be inferred from conduct such as below cost selling. Petitioner seeks also to distinguish the Utah Pie Co. case from the instant case on the ground that there ws no drastically declining price structure occurrence in the instant case as there was in the Utah Pie case. Competitors in the instant case could not equal the first and only price cut of petitioner because it was at such a drastic below cost level or otherwise compete with petitioner's program. Under these circumstances, the Utah Pie case specifically establishes that sales losses of competition are the

equivalent of severe price cuts of such competition. Likewise petitioner's reliance upon the holding in the case of Dean Milk Co. v. Federal Trade Commission, 395 F.2d 696 (7 CA 1968) is misplaced. The evidence in the instant case differs materially from the *Dean* case record. In that case, it was conceded by the Federal Trade Commission that Dean was not guilty of predatory intent unlike the instant case. The below cost sales promotions of Dean were brief and sporadic and the extent to which costs exceeded prices were negligible (three day week end promotions). Quantity discount system was also involved. During the time of purported injury Dean's competitors increased their business. There were no radical price cuts by Dean and there were no drastically declining price structures. Furthermore, Dean was a medium sized regional dairy doing business in seven mid-west states with a wholly owned subsidary serving the State of Kentucky and southern Indiana.

## FINAL ORDER

Should this court affirm the Commission's finding of a Section 2(a) violation, the petitioner requested that the Commission's order should be modified.[11] It believes the order should be modified so as to limit its prohibitions to pricing devised with the intent and purpose of injuring or destroying a competitor and by limiting its product coverage to fruit spreads. Petitioner in support of the request reasons that the order is excessively broad in that it bears no reasonable relation to the limited scope of the charges upheld by the Commission. It further reasons that the order would unjustifiably curtail petitioner's ability to engage in customary promotional practices, including those held to have been lawful in the proceeding (yogurt and marshmallow promotions), contrary to the public interest in maintaining vigorous competition.

We agree in part with the petitioner's objection to the order. The order should have been formed to fit the

11. "IT IS ORDERED that respondent National Dairy Products Corporation, a corporation, and its officers, representatives, agents and employees, directly or through any corporate device, in connection with the sale or offering for sale of jellies, preserves and any other food product in the product line of its Kraft Foods Division, in commerce as 'commerce' is defined in the Clayton Act, do forthwith cease and desist from: Discriminating, directly or indirectly, in the price of such products of like grade and quality by selling such products to any purchaser for resale at a price which is less than the price charged any other purchaser for resale at the same level of distribution when such lower price is either the result of a reduction from the regular list price of the products or is the result of a promotional offer involving a concession from regular list price; provided, however, that in addition to the defenses set forth in Sections 2(a) and 2(b) of the statute it shall be a defense in any enforcement proceeding instituted hereunder for respondent (1) to establish that its lower price was the result of a promotional offer involving a price concession which does not undercut the lowest net price and/or the terms and conditions resulting from a promotional offer made to the purchaser receiving the lower price by any seller of a competitive product within the previous 12 months, or (2) to establish that such lower price does not undercut the lowest price concurrently offered generally throughout the same trading area by any other seller of a competitive product having a substantially smaller annual volume of sales of such products than respondent's annual volume of sales of the product on which the discriminatory price was granted.

\* \* \*

IT IS FURTHER ORDERED that the initial decision of the hearing examiner, as modified, be, and it hereby is, adopted as the decision of the Commission.

IT IS FURTHER ORDERED that respondent, National Dairy Products Corporation, shall, within sixty (60) days after service upon it of this order, file with the Commission a report, in writing, setting forth in detail the manner and form in which it has complied with the order to cease and desist set forth herein.

\* \* \*."

case. The perpetual order so including all of the many existing and new future food products is too broad under the circumstances of this case. The order should have been limited to fruit spreads. The evidence does not support the conclusion that there is a reasonable basis to infer that the condemned practices and propensity of petitioner if used in connection with all other products would violate Section 2(a). In fact there is evidence to the contrary. The order as broadly stated would include marshmallow topping and the Commission has dismissed a Section 2(a) charge after finding there was no violation. The dismissal of the charge specially weakens the basis for the broad order.[12] The Commission in finding the fruit spread violation distinguished the use of similar programs and industry practices on the ground that the products were of a different class than fruit spreads. We find no other evidence of the market facts of the other products or other justification for the order's inclusion of all products. The Hearing Examiner was equally wary of an all products order.[13] We believe the remedy directed at all products of the violator under the circumstances of this case has no reasonable relationship to the scope of the fruit spread charges and findings thereon and is unsupportable. The broad order unfairly affects petitioner's ability to compete for the market with its products other than fruit spreads.

■ The order as limited to fruit spreads is related to the found violation and is justified by the evidence and the foreseeable practicalities of the future. The order prohibits below cost territorial price discrimination by petitioner of which practice it was found guilty. The order in doing so prohibits petitioner from using similar programs in local trade areas to discriminate either by the use of promotions below its regular price list or by offers of a concession from its regular price list. The concession practice restriction is aimed at the same practice used in the 1961 violation. The additional restriction is also related to the violation and justified to avoid an evasion of the concession restriction by an outright reduction in one or more local areas. E. Edelmann & Co. v. Federal Trade Commission, 239 F.2d 152, 156 (7 CA 1956), cert. denied 355 U.S. 941, 78 S.Ct. 426 (1958). This evasion restriction is subject to the defenses set forth in the previous quoted order and prohibits promotions below regular list price.

■ We reject another of petitioner's objections to the order that it is anti-competitive. The Commission has held that there is nothing inherently or *per se* unlawful in territorial or area price differences. The order follows this holding. Petitioner's regular list prices are unaffected by the order. Petitioner is free to set whatever regular list prices it wishes for application to local areas. It is in the same competitive position with respect to list prices as any other marketer in entering new market areas, in stimulating competition with other competitors or in experimenting or test marketing preparatory to reducing prices throughout market areas. Under the order, in addition to the Section 2(a) and 2(b) defenses of cost justification and meeting competition, the petitioner can go below its established list prices locally so long as it does not harm smaller competitors by undercutting them, and can match any promo-

12. The fruit spread violation charge was first filed. Thereafter, the Commission approved the filing of the marshmallow topping violation charge as an amendment to the pending complaint upon Commission counsel's representation that an all food products order would be requested. Counsel represented that such amendment would avoid unnecessary expense in trying the same contested pricing practice in one proceeding.

13. The Hearing Examiner stated that the nature of the food and grocery business is such that an extremely broad order including all products of the petitioner would result in insurmountable problems, both with respect to the economics of the industry and enforcement.

tions by competitors in local areas during the prior twelve months. The prohibition against undercutting smaller competitors is not new or novel and it, nor does the order generally, as petitioner complains, prohibit any kind of price promotion. A prohibition provision of orders against undercutting smaller competitors has substantial support in the decided cases. See Lloyd A. Fry Roofing Company v. Federal Trade Commission, 371 F.2d 277, 286 (7 CA 1966); Forster Mfg. Co. v. Federal Trade Commission, 361 F.2d 340 (1 CA 1966), cert. denied 385 U.S. 1003, 87 S. Ct. 706, 17 L.Ed.2d 542; and Maryland Baking Co. v. Federal Trade Commission, 243 F.2d 716, 719 (4 CA 1957). The restrictions placed on petitioner do not prevent it from fairly and vigorously competing. The order was made in the public interest to preserve competition from smaller, regional and local competitors and it did not interfere with petitioner's competitive rights but withdraw petitioner's total pricing freedom. Petitioner has been fairly treated in the order.

Petitioner believes the order should be limited to pricing motivated by predatory intent. We find no basis for such a limitation in the order. The Act deals with the effect of the discrimination of the petitioner irrespective of the presence of predatory intent in its practicing of discrimination. The Commission exercised sound discretion under the circumstances in not adopting the petitioner's requested limitation. Specific intent of a violator of the Act as well as of an order of the Commission is elusive and consequently difficult to prove in violation proceedings. The Commission possessed the facts of petitioner's past conduct and had the duty as well as the peculiarly knowledgeable authority and discretion to frame its order to fully protect competition within the meaning of the Act.

In accordance with the provisions of 15 U.S.C. Section 21(c) the enforcement is ordered of the affirmed part of the final order of the Commission pertaining to the jam, jelly and preserve products of the Kraft Foods Division of National Dairy Products Corporation. The proceeding is remanded to the Commission solely for the purpose of modifying its final order with respect to the products included therein in conformity with this opinion.

Final order modified, and enforcement ordered of modified order.

SWYGERT, Circuit Judge (dissenting).

I dissent from the majority's holding for the reasons set forth in the dissenting opinion of Commissioner Elman of the Federal Trade Commission.